UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 26-MJ-53(1) (MJD/LIB) |
| Plaintiff, | ) | |
| vs. | ) | Duluth, Minnesota |
| | ) | May 4, 2026 |
| Mohamed Abdirizak Jama, | ) | 1:30 p.m. |
| | ) | **DIGITAL RECORDING** |
| Defendant. | ) | |

---

BEFORE THE HONORABLE LEO I. BRISBOIS
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTION HEARING)**
**DOCKET NUMBERS 34, 35, 36, 37**

APPEARANCES

For the Plaintiff: DOJ-USAO
WILLIAM L. RICHARDS, III, AUSA
ROBERT TUCKER, AUSA
300 South Fourth Street
Suite 600
Minneapolis, Minnesota 55415

For the Defendant: Dorsey & Whitney LLP
SURYA SAXENA, ESQUIRE
50 South Sixth Street
Suite 1500
Minneapolis, Minneapolis 55402

Transcriber: Lori Morrow, RDR, CRR, CRC
316 N. Robert Street
U.S. Courthouse, Suite 146
St. Paul, Minnesota 55101

Proceedings recorded by digital recording; transcript produced by computer.

**I N D E X**

WITNESSES: PAGE:

MICHAEL MUNIZ

Direct Examination by Mr. Richards.... 41
Cross-Examination by Mr. Saxena....... 68

ABDIRASHID ADAN

Direct Examination by Mr. Saxena...... 139

* * *

**P R O C E E D I N G S**

**IN OPEN COURT**

**(Commencing at 1:32 p.m.)**

THE COURTROOM DEPUTY: All rise. United States District Court is now in session. The Honorable Leo I. Brisbois presiding.

THE COURT: Please be seated.

Good afternoon. This is the matter of the United States of America versus Mohamed Abdirizak Jama, 26-MJ-53.

Counsel, please note your appearances, representation for the record, starting with the government.

MR. RICHARDS: Good afternoon, your Honor. On behalf of the United States, Special Assistant United States Attorney William Richards.

THE COURT: All right.

MR. TUCKER: Good afternoon, your Honor. On behalf of the United States, Special Assistant United States Attorney Robert Tucker.

THE COURT: Mr. Tucker, you're not counsel of record.

MR. TUCKER: Yes, your Honor.

THE COURT: We just checked.

MR. TUCKER: Yes, your Honor. I'll be filing a notice of appearance today, your Honor.

THE COURT: Okay. Make sure it gets done.

MR. TUCKER: Yes, your Honor.

THE COURT: All right.

MR. SAXENA: Good afternoon, your Honor. Surya Saxena appearing for the defense, Mr. Jama, who is here and present in court on my left.

THE COURT: All right. So this hearing is for motions. We have Docket Number 37, which is the defense motion for discovery. That motion doesn't require evidentiary hearing. Does anybody wish to be heard on that, or are the papers sufficient?

MR. SAXENA: That's the only motion that I just ask a brief argument on, your Honor, before we --

THE COURT: Sure.

MR. SAXENA: Thank you.

Your Honor, I for the other motions would be happy to submit them on the papers. I guess I do expect to request briefing on both the motion to suppress and the motion to dismiss for outrageous government conduct.

THE COURT: Yeah, we'll get to that.

MR. SAXENA: With respect to the motion for discovery, your Honor, most of the categories that I have requested on page 2 of the motion you just referenced, I have questions as to whether all materials have been produced. For example, I think we'll see today during the evidentiary hearing that many of the officers that were on

the scene had cell phones and body camera footage. Many of them were conducting searches and should have browsing history. They were communicating with each other. But I have not received any radio traffic, dispatch records. We can certainly flesh this out further after the evidentiary hearing, but my argument to the Court is that I don't believe that the government has stated that any of these items are nondiscoverable, nor have they certified to me that they have produced all of the categories that are listed in the motion, so I would just renew my motion and ask the Court to order the government to produce absolutely all of the documents and information that I've listed in the motion.

THE COURT: Are you saying in the absence of a specific objection I'm compelled to order production?

MR. SAXENA: You're not, your Honor, but --

THE COURT: I mean, I --

MR. SAXENA: -- consistent with Rule 16 --

THE COURT: That's what I'm, I guess, getting at, is the Court is familiar with the Rule 16 parameters as well as the *jurisprudence* around that and the *Brady/Giglio*. You know, I mean, on the face of some of it, in the context of the case, I mean, I can agree with you or disagree with you, right? I'm not -- so that gets me back to my question, is, in the absence of an affirmative objection, am I bound to

agree with your request for production, or do I have to exercise an independent level of analysis?

MR. SAXENA: Yeah, your Honor, I think that under Rule 16, each of the items that I've listed is discoverable, and what I have not heard from the government is that they have produced everything in the government's possession --

THE COURT: Okay.

MR. SAXENA: -- that falls into these categories. And so barring any further explanation from the government, my response to you would be yes, I think all of these items are discoverable, they are all material to presenting a defense, or they constitute the defendant's own statement, or the *res gestae* of this offense, and I think the evidentiary hearing today will demonstrate that there should be more that I have not received.

THE COURT: Which paragraphs specifically are you concerned about?

MR. SAXENA: Well, I'm concerned, frankly, about all of them, and I can walk through all of them, but I'm trying to -- I guess I was trying to --

THE COURT: Well, we have --

MR. SAXENA: -- do this in short --

THE COURT: -- all the whole afternoon to --

MR. SAXENA: -- shift. I'm happy to go through.

THE COURT: Yeah.

MR. SAXENA: Your Honor, there's at least 12 different -- so Category 1, I believe there was at least 12 different agents and officers on scene, perhaps more. In addition, the reports and the videos demonstrate that the officers that were on the scene were communicating perhaps by Teams and also by radio with other agents that were involved. However, we've only received, I believe, four body cameras, even though it seems that every officer on the scene should have a body camera video. We haven't received all of the video from cell phones even though it appears that officers were taking video with their personal cell phones. We haven't received any audio or video from the transport of my client from St. Cloud to the Whipple Federal Building, but it appears that there was video and audio taken of the transport of two individuals, so -- I could go on and on, and I think that the videos that we do have demonstrate that there should be more, but the government just hasn't said anything about that.

Two, we haven't received anything. We haven't received any criminal histories or personnel files for any agent that was involved. I believe that those exist. I haven't heard a reason why they are not relevant or potential *Giglio*. We have not received training records for any of the agents and officers, which I think will become very clear why we're asking for those when we hear the

testimony from the agent today.

Four, we have multiple agents on scene that were seen searching databases on their cell phones. I don't know if those are work cell phones or personal cell phones, but we have not received complete results of those searches, nor have we received search history, nor is it clear which databases were actually searched.

Five, similar, we don't know which databases were checked, specifically with respect to vehicle records and Minnesota DL records, driver's license records. Excuse me.

Six relates to radio traffic and dispatch. There's radios that are visible in the video, there's communications that are happening on the video, but we have no information as to whether there's a dispatch record as you would see with most state and local police departments or whether those records just don't exist.

Seven, we've received nothing --

THE COURT: Do we know whether the DHS has a dispatch system like local police, highway patrol? Do we know --

MR. SAXENA: We don't know. We haven't received a response.

THE COURT: And so you're -- okay.

MR. SAXENA: I don't know the answer to that question, your Honor.

THE COURT: If it doesn't, then that stuff might not exist, but we don't know that.

MR. SAXENA: It may not.

THE COURT: Yeah.

MR. SAXENA: The police records -- the police reports, or I should say interview reports and DHS reports that were generated after this incident indicate that these individuals were communicating via Teams, Microsoft Teams.

THE COURT: Yeah, which could be a phone or a laptop or an iPad. But it's not a radio system like dispatch, like the phrase you used.

MR. SAXENA: Correct.

THE COURT: Yeah, okay.

MR. SAXENA: But Teams does save records of the communications, your Honor, and the timing of the communications.

You know, eight, I believe that we've received some photographs, but we have not received any certification that we've received all photographs, texts, emails, chats, or other cell phone data that was captured relating to these law enforcement officers. As I think will potentially be demonstrated during the hearing and as we've seen through public reporting, DHS agents have regularly taken selfies and cell phone videos of individuals that they have arrested on the way to the Whipple Federal Building and after they

were arrested. And in this case, we believe that that did happen both on the way to Whipple and after the arrest. We have not been provided with any copies of those videos and selfie photographs that were taken involving the defendant, and those are relevant to us presenting a defense at trial.

We know that there was a complaint affidavit in paragraph 9 that was submitted to the Court and then withdrawn when this case was recharged as a misdemeanor, but we have not received any draft affidavits or communications about the drafting of that affidavit by an individual who was not at the scene.

Training records, already discussed. Disciplinary files, internal affairs files, we have no reason to believe that the *Giglio* checklist has been used with respect to the witness that is going to testify today. I have not received a certification from the government that they have checked to see whether there are any internal affairs files, findings, or whether a *Giglio* checklist has been completed as to any testifying officer.

For 12, we believe that we have received all reports and that none of the Border Patrol officers and agents that were involved in the events actually prepared any police reports. We believe that they were just interviewed internal affairs style by DHS agents. However, we would like some certification from the U.S. Attorney's

Office that there are no other reports, because apparently none of the officers that were actually on scene wrote any reports.

We've talked about 13 related to body cameras, text messages, booking and arrest records, any emails that were used to communicate about this incident. We have received no evidence or chain of custody logs. And we don't know about documented verbal conversations with any witnesses.

Thank you.

THE COURT: Anything else?

MR. SAXENA: No. Thank you.

THE COURT: Mr. Richards?

MR. RICHARDS: Your Honor, the government intends to comply with all of its Rule 16 --

THE COURT: Well, let me just --

MR. RICHARDS: Yes.

THE COURT: I got your written response.

MR. RICHARDS: Yes, your Honor.

THE COURT: The only specific response -- everything else is "we've complied, we continue to comply." Doesn't talk about any specific paragraphs. The only specific objection is attorney work product and, as I understand it, in reference to the drafting of the affidavit in support of the complaint. Beyond that, the response of

the government doesn't tell me what's been produced, what exists, what doesn't exist, whether it should be produced or shouldn't be produced relative to the respective paragraph. So now is your chance.

MR. RICHARDS: Yes, your Honor.

And with respect to the checklist, or the list of 13 items the defense counsel requested, if the Court would allow the government to just go through as quickly as possible.

THE COURT: Yes, the same as I did with Mr. Saxena. What paragraphs -- are there materials that have yet to be produced? Which paragraphs, if any, do materials not exist? You know, you're an officer of the court. You can make that representation on the record.

MR. RICHARDS: That's correct, your Honor.

And again, this is with the caveat I entered my appearance on this case a few weeks ago, and I endeavored to meet with Homeland Security about the discovery materials with respect to this investigation. And what I was provided is my understanding of the complete discovery based upon what Homeland Security has given me, and I thereafter disclosed that to defense counsel.

Now, some of what the defendant is asking for, the government submits, is being utilized to expand *Brady* or *Giglio* or alternatively to creep into what would be

considered *Jencks* material.

THE COURT: Well, *Jencks* applies only to statements.

MR. RICHARDS: That's correct, your Honor.

THE COURT: It doesn't apply to *Giglio* or *Brady* or other materials that are relevant to the claims the defense used.

MR. RICHARDS: Yes, your Honor. And just specifically with respect to, defense counsel wants criminal histories and personnel files. The government thinks that's overexpansive than what's required under *Brady* and *Giglio*. Certainly if any agents or officers do have criminal histories, that will be provided to defense counsel in accordance with the justice manual and with prevailing law.

THE COURT: Let's just go through them one paragraph at a --

MR. RICHARDS: Sure.

THE COURT: -- time by number. You know, because, as I said, the government's written response says we have complied, we will comply. It says the same with regard to *Brady*/*Giglio*, but then the only specific objection is to work product.

So just, I mean, I need this information so that I can decide what I'm going to do with each of these requests.

MR. RICHARDS: Yes, your Honor.

With respect to Item Number 1, the government's understanding is that all cell phone video and body-worn camera footage from the agents and officers that were involved with the incident that led to the defendant's arrest was provided.

With respect to criminal history and personnel files, those were not provided, but with the caveat due to the timing portion of *Brady* and *Giglio*. Furthermore, the government would.

Submit the entirety of personnel files is overexpansive of what our obligations under the law requires, specifically as it relates to impeachment material. The government will provide that information on a timely basis and -- allowing the defendant to utilize that information.

THE COURT: Okay. Criminal histories are impeachment materials. Personnel files, you know, their health insurance elections, that kind of stuff --

MR. RICHARDS: Yes.

THE COURT: -- not so much. But, you know, training for conducting stops, maybe. But if there's any disciplinary actions in there unrelated to criminal activities, that might be impeachable.

MR. RICHARDS: Sure.

THE COURT: So, you know, what parts of the

personnel files do you -- you know, when you say it's overbroad, that in and of itself is an overbroad statement. I'm not sure what parts you anticipate looking for.

MR. RICHARDS: Everything that relates to Rule 16(a)(1)(E) that could relate to the defendant's defense, certainly any substantiated or unsubstantiated findings that relates to truthfulness, bias, or unlawful police activity, that will certainly be disclosed to the defendant.

THE COURT: All right.

MR. RICHARDS: And criminal histories obviously.

THE COURT: And all Border Patrol and DHS agents involved in the incidence on January 20, 2026, are known to you?

MR. RICHARDS: Yes. My understanding is the individuals that were on the ground that observed the defendant's actions that day, that interacted with him, that arrested him, and thereafter were transferred to the Whipple Building for processing, I believe all that is borne out in the government's disclosure to defendant.

THE COURT: All right.

What about the training records, paragraph 3? Unless it's specifically -- is it something different than personnel records, or is it a subset of personnel records?

MR. RICHARDS: I construed on just what the defendant wrote. I would submit it's different. I mean,

there's general training records that government agencies relating to law enforcement have. I think that request is overbroad. Doesn't specifically relate to anything in this case. Doesn't specifically relate to Rule 16. It's not tethered to a defense. It's really unclear how this would be relevant to produce.

THE COURT: Okay. Paragraph 4?

MR. RICHARDS: So certainly with respect -- well, the government has disclosed database entries as it related to the predicate for the stop of the defendant's vehicle in this case. With respect to all histories and search queries on the Internet, if it's -- to the extent it specifically relates to the agents' interactions with the defendant and could be material to the case, the government would comply with such a request. However, standing here today, I don't have any information that such additional information does exist, but efforts will be made if the Court orders.

THE COURT: Have there been productions made under that paragraph already or --

MR. RICHARDS: To the extent that database query results were disclosed to the defendant, yes. However, for all search histories made on the Internet for each of the individuals involved in the case, no, your Honor. Are intranet sites available? No, your Honor. But with vehicle registration, that's part of the query that was ran by the

officers and that was disclosed to the defendant as well, so the driver information for that. Now, whether or not that request relates to all state and federal database whether or not available to the public, the government would submit that's overbroad.

THE COURT: Well, I imagine that when there were potentially queries and searches throughout the day prior to this incident, the next day unrelated to this incident, I mean, isn't the -- this should be somewhat self-limiting to the information in this case, so --

MR. RICHARDS: Yes.

THE COURT: -- you can narrow the -- what you consider overly broad can be specifically tied to this case, right?

MR. RICHARDS: Yes, and that's what the government's convention is, is that it would specifically be related to this defendant and this interaction. Anything before or subsequent would be not relevant.

THE COURT: Okay. Paragraph 5 seems like it's another way of saying what was in paragraph 4. But what's your position on it?

MR. RICHARDS: That would be the government's interpretation of 5 as well, your Honor. The same -- to the extent it's specifically tethered to this defendant in this -- if you want to call it a roadside investigation or

on-scene investigation, the government would comply. However, anything outside of that the government would submit is not relevant and not discoverable.

THE COURT: What can you tell me about number six? What's the -- what are the radio capabilities, communication platforms, you know, for -- you know, again, there's a difference between county sheriffs, highway patrol, state, city police, you know, military. I mean, you know, I don't have any reason to know what it might be for Border Patrol, DHS. I mean, and that, I think, is the focus of Mr. Saxena's inquiry based on his comments is he doesn't know either.

MR. RICHARDS: Sure. Absolutely, your Honor.

THE COURT: It's hard to know what to ask for if you don't know what the system is.

MR. RICHARDS: That's fair. Now, if there are recordings that specifically relate to the defendant's -- or border patrol's interaction with defendant, the government would certainly comply.

THE COURT: But, I mean, how do they communicate?

MR. RICHARDS: Well --

THE COURT: Let's start at the very basic. How are the communications done in the field?

MR. RICHARDS: It's been varied, your Honor, throughout the entirety of the operation with respect to

different agencies as well. Through different cases and investigations and disclosure obligations, we've seen a different type -- or different types of communications with people in the field. Specifically for Border Patrol, I believe there is a dispatch system; however, I'm not aware at this time if there is a recording system similar to the sheriff's or local police department. I have seen Immigration and Customs Enforcement or Border Patrol in other cases utilize radio communications that were not saved. They are applications on government phones similar -- it would be like a radio communication or walkie-talkie app that they would use to simultaneously or in real time communicate with one another. My understanding is those communications are not stored.

With respect to Border Patrol in this case, again, the government did request that all discovery relating to communications and these request signs [sic], if they exist, to be disclosed. The government certainly can endeavor again with Border Patrol to ensure that there are no stored radio communications or dispatch recordings that may exist through agents in the field. So the government would request comply with that request as it specifically relates to the investigation of the defendant.

THE COURT: Are the agents involved from across the various DHS, Border Patrol, CVP agencies, and the

systems, are they based in Minnesota?

MR. RICHARDS: I am not sure, your Honor. And I'm not sure if -- I believe they are bifurcated or they are separate systems, but I'm not sure where they are based.

THE COURT: Well, I don't mean the hardware. I mean, if the records exist, you know, are they part of an agent's duty station and office and systems here, or are we talking about a record system, however diverse it might be, in other states, other jurisdictions? What are --

MR. RICHARDS: For radio communications, I do not have a definite answer for you right now, your Honor. The government will certainly find out.

THE COURT: Well, the reason I'm asking, then how do we know we've looked under every bush if we don't know what the systems are or what they are?

MR. RICHARDS: Sure.

THE COURT: So I'm -- okay. All right.

Have any radio communications, dispatch records or cell phone records arising out of the January 20, 2026, events been produced?

MR. RICHARDS: I don't believe so, your Honor, no.

THE COURT: And that's because none have been located or because we haven't looked everywhere yet? Or we don't know?

MR. RICHARDS: I suppose a combination of all

three, your Honor. And again, based on my recent appearance on the case --

THE COURT: Okay.

MR. RICHARDS: -- the understanding was it was complied with. However, well, the government will take every effort possible to get your answer as to all three prongs of that inquiry.

THE COURT: Yes, it will.

MR. RICHARDS: Yes.

THE COURT: Okay. Paragraph 7, this is the focus of your work product objection, right?

MR. RICHARDS: Yes.

THE COURT: Okay. Anything else you want to say about that?

MR. RICHARDS: No, your Honor. The government would rely on our previous experience with respect to that.

THE COURT: Okay. Paragraph 8, have all photographs arising out of or related to the events of January 20 been produced?

MR. RICHARDS: Your Honor, I would give the same answer as I did with respect -- if this relates to what -- similar information 6 is referring to, I would say so. However, just reading 8, just going off of the plain reading of it, it is a little unclear as to what it relates to, "depicting any of the aforementioned law officers or data

captured by the law enforcement officers," I mean, if this relates to January 20, then okay, but I'm just not so sure. It's a little broad.

THE COURT: Well, I mean, if it relates to April 15, it's not relevant.

MR. RICHARDS: Correct.

THE COURT: Yeah.

MR. RICHARDS: Correct. So to the extent for January 20, then the government would comply with that request and will as it relates to -- well --

THE COURT: All right. Paragraph 10 is just a broader version of paragraph 3. It's about training records, education records. We've talked about that. Disciplinary files, internal files, again, that's another way of talking about paragraph 2. We've talked about that.

How about paragraph 12?

MR. RICHARDS: The government submits --

THE COURT: Were local law enforcement, the St. Cloud Police, Stearns County Sheriffs, they weren't involved in any of this, were they?

MR. RICHARDS: No, your Honor, not from my understanding. It was just Border Patrol and then these post arrest and --

THE COURT: And it sounds like, as Mr. Saxena understands the discovery he's received, the involved agents

didn't write reports. They sat for interviews, and someone else wrote those reports, and those reports have been produced?

MR. RICHARDS: Yes. That's the government's understanding, your Honor.

THE COURT: Is there any other reports?

MR. RICHARDS: Not that the government is aware of, your Honor.

THE COURT: Who is the custodian of the reports that were produced?

MR. RICHARDS: Department of Homeland Security. So for some of the witnesses involved, that were predominantly involved, they sat for an interview. That interview may or may not have been recorded. If it was recorded, that was disclosed to defense counsel. And alternatively, the Department of Homeland Security had a written report summarizing in part the contents of the oral interview, and those were disclosed to defense counsel, all those reports.

THE COURT: Do the reports that were produced inform the defense as to whether -- who the interviewer was and whether or not it was recorded or not?

MR. RICHARDS: Yes.

THE COURT: Okay. And if it wasn't recorded, then it would say who the interviewer was and that that person

prepared this report based on their notes and their memory?

MR. RICHARDS: Yes. Yes. Generally, there seems to be some -- I don't want to say standardized, but in the -- you know, the top of the document will have who is conducting the interview. The second portion will have something along the lines if it's not an exact, you know, transcript of the recording, there's a copy out there. And then there will be the substance, and then afterwards there should be an indication of if it was recorded or not, in no particular order.

THE COURT: Okay. The individual officers involved on January 20 in St. Cloud, they didn't produce any of their own reports? We're pretty certain of that?

MR. RICHARDS: To the extent the requests were made, your Honor, by the government for such documents, yes. However, I will caveat, all this -- endeavors will be made, especially --

THE COURT: Okay. Paragraph 13 is the dash cam, body cam, any devices that were present. Have they been identified? Not -- that's Step 1. Do we know how many devices there were on scene? Step 2 is whether any of them -- or how many of them were activated. Do we know any of that, or just the ones that you've been able to find have been produced?

MR. RICHARDS: Probably closer to the latter;

however, there was a targeted effort to determine what body-worn cameras were active and were recording with respect to this particular incident. However, a more formalized disclosure to defense indicating everybody that was there, who was wearing body cam and what cameras exist and what footage exists and what was disclosed certainly can be provided.

THE COURT: Well, I mean, in the past 15 years, I mean, sometimes the presence of body-cam technology that hasn't been activated has been an important issue.

MR. RICHARDS: Yes.

THE COURT: So it seems like that falls within this paragraph.

MR. RICHARDS: Certainly, your Honor.

THE COURT: Okay. All right. Anything else?

MR. RICHARDS: No, your Honor. Thank you.

MR. SAXENA: May I briefly reply, your Honor?

THE COURT: Yeah, very briefly.

MR. SAXENA: A couple quick clarifications for the Court, and I will keep it brief. One is just -- in case there's any confusion, page 1 of the motion for discovery spanning on to page 2 is sort of the preamble for each of the paragraphs, and it does limit the requests to this case, the defendant, the incident that is under investigation.

With respect to Category 4, your Honor, I have not

received any vehicle registration records. There is references in the materials I have received to looking at vehicle registration records, but I have not received any. I have not received the results of the searches that I think we're going to hear about today, and so that is what that request is focused on.

And then the last thing I would say, which is perhaps obvious, but I will state it for the record anyway, is that -- well, two things I guess. One is I am very sympathetic to the fact that there are new prosecutors at the U.S. Attorney's Office. I was new at one point, and it is hard. But *Giglio*, the case itself is about a new prosecutor. *Brady* and *Giglio* -- the case *Giglio*, it's about a new prosecutor. It's about a new lawyer who joins the U.S. -- the DOJ and has to produce materials that were in the file of a prosecutor who has left the office. And there must be some responsibility to answer these types of Rule 16 questions, *Brady* and *Giglio* questions, by the deadline that is set by the Court. And I'm concerned that what I'm hearing is that the office is not sure whether these items exist or not. And that is not consistent with the Court's arraignment order, which I think set a deadline by which items that already exist should have been disclosed, or there should have been an explanation that they don't exist or perhaps an argument that they don't need to be disclosed.

And then the last thing I would note is I also hear the government saying that before trial they will comply with their *Brady* and *Giglio* obligations. But we're going to have a witness testify today. And what I'm very concerned about is that they haven't complied with their *Brady* and *Giglio* obligations and given me all of the impeachment information that I need to cross-examine or consider cross-examination of their witness for today. And that's concerning. The only way I can really remedy that is by making a motion to reopen this motions hearing and, I guess, plead that there has been prejudice to my client as a result. And that's not an efficient way to go through this process.

THE COURT: Well, I mean, that may or may not be necessary at this point. That's something that if the circumstances develop that you think that's necessary, you can do that and I can make a decision on the basis of a proper record at that time. But I understand your concerns. And that's why *Giglio* and *Jencks* require to be produced --

MR. SAXENA: Thank you, your Honor.

THE COURT: -- at the time of testimony, trial or otherwise, to avoid those delays.

MR. SAXENA: Right.

THE COURT: All right. Well, I anticipated what you said before about, after the evidentiary hearing on the

motion to dismiss for outrageous conduct and then the suppression motions seeking additional briefing on the basis of, I'm assuming, a transcript. You plan to order, right?

MR. SAXENA: Most likely, yes, your Honor.

THE COURT: Yeah. So although in many cases I will issue an order and report recommendation at the same time, in this instance I'll issue a discovery order sooner rather than later, within the next week or two.

MR. SAXENA: Thank you, your Honor.

THE COURT: All right. Docket Number 37 then on the basis of the briefing and the oral argument submitted under advisement subject to order.

Docket Number 35, defendant's motion to dismiss the information for failure to state an offense or, in the alternative, for a bill of particulars, I've reviewed the materials. I don't see this requiring an evidentiary hearing. This is a review of the document on its face. Am I right or wrong?

MR. SAXENA: I don't believe it requires --

THE COURT: That's okay.

MR. SAXENA: I should have stayed up here.

I don't believe it requires a review of the record, your Honor. It's just that there's multiple ways to supposedly violate the statute. And I think viewing the video today -- I expect we'll view a video today that makes

it unclear what part of the statute is actually being charged.

THE COURT: All right. All right. Thanks.

MR. SAXENA: Thank you.

THE COURT: Do you want to be heard on that one? I mean, you addressed it in writing. But it's up to you. I mean, I'm not going to tell you --

MR. RICHARDS: The government would rely on its arguments.

THE COURT: Written submissions?

MR. RICHARDS: Yes.

THE COURT: Okay. Thank you.

Then document number 35 is submitted under advisement, and it will be part of the report and recommendation.

I don't anticipate and I would not expect that in any subsequent briefing after the events hearing, Docket Number 35 will not need to be further addressed. So, all right?

All right. Then that leaves Docket Number 34, defense's motion to dismiss the information for "outrageous government conduct." And then Docket Number 36, defense's motion to suppress all evidence of the *Terry* stop and the ultimate arrest. Are we ready to proceed?

MR. SAXENA: Yes, your Honor.

THE COURT: How many witnesses?
MR. RICHARDS: One witness, your Honor.
THE COURT: Who is that?
MR. RICHARDS: Border Patrol Agent Marco Antonio Muniz.
THE COURT: Okay. Any exhibits?
MR. RICHARDS: Yes, your Honor.
THE COURT: What are they?
MR. RICHARDS: They are five digital files on a USB.
THE COURT: And what are the five files?
MR. SAXENA: The first two are digital photographs. They are query photographs of the database -- or the result of the records check performed by the witness as it relates to the vehicle the defendant was driving.
THE COURT: So two photographs?
MR. RICHARDS: Yes, your Honor. Number three is body-worn camera footage.
THE COURT: Okay.
MR. RICHARDS: And the last two are photographs.
THE COURT: Okay. Any other exhibits?
MR. RICHARDS: No, your Honor.
THE COURT: Okay. Has this been premarked?
MR. RICHARDS: Yes.
THE COURT: Government exhibit what?

MR. RICHARDS: It's marked as 1 through 6, so one is the USB and then five digital files are however the Court --

THE COURT: Okay. Have you given a copy to the defense?

MR. RICHARDS: I disclosed to defendant, yes. Yes, your Honor.

THE COURT: Okay. Any objections?

MR. SAXENA: To the admissibility of the exhibits or --

THE COURT: Well, you know how this works. Are you going to challenge the Court receiving these?

MR. SAXENA: No, your Honor.

THE COURT: Okay.

MR. SAXENA: I would be happy to stipulate.

THE COURT: Okay. So Government Exhibits 1 through -- well, 1 being the drive. There's really only five exhibits, 2, 3, 4, 5, and 6?

MR. RICHARDS: Yes, your Honor.

THE COURT: All right. So they are admitted for purposes of this hearing obviously.

MR. SAXENA: No objection, your Honor.

THE COURT: Okay. You're going to use them, Mr. Richards?

MR. RICHARDS: Yes, your Honor.

THE COURT: Okay. I want to make sure that when the hearing is over that it's produced to the courtroom deputy.

MR. RICHARDS: Yes, your Honor.

THE COURT: Thank you. Mr. Saxena, any witnesses?

MR. SAXENA: Yes, your Honor. We'll be calling one witness. His name is Abdirashid Adan, A-d-a-n. And we may have additional exhibits. I have provided copies of the exhibits that I am most likely to offer --

THE COURT: Okay.

MR. SAXENA: -- to the government.

THE COURT: Just --

MR. SAXENA: There may be some exhibits that I would prefer not to share as impeachment, but I can assure you that anything and everything that I offer has come from the -- well, anything that I haven't disclosed in advance of this hearing has come from the government's discovery.

THE COURT: Okay. How many exhibits potentially?

MR. SAXENA: I would have to look at my laptop, which is here, but I believe there are five additional exhibits, four additional exhibits.

THE COURT: That you may or may not use?

MR. SAXENA: I may or may not use them. It sort of depends on what the direct examination is.

THE COURT: Okay. But you haven't disclosed them

in advance of this hearing?

MR. SAXENA: I have disclosed everything to the government that is -- I have disclosed everything to the government that I believe will be a substantive exhibit, which is not from their own discovery. So I have produced copies of those items.

THE COURT: Okay.

MR. SAXENA: There could be impeachment exhibits, which potentially everyone will agree should be admitted. And those are not -- are materials that the government has equal access to, public. And I don't know whether I will need to use them because I don't know what the agent is going to testify to today.

THE COURT: Okay. So at this point, the only evidence you know for sure is going to be your witness?

MR. SAXENA: No, your Honor. I have provided -- well, I can tell you --

THE COURT: Well, let's do it this way.

MR. SAXENA: Yeah.

THE COURT: Things that you know you're going to use for sure, let's get them in now just like we do with most everything. The ones that you may not use depending on whether you're going to use them for impeachment or not, because it will depend on how the testimony comes in, we can deal with those subset when and if you think they are

necessary.

MR. SAXENA: Thank you, your Honor. Yeah, I apologize. It's just that my laptop is up here, and that has the list.

So there are eight exhibits which I expect to use. One of them is a photograph of a driver's license of the defendant, which I received from the government.

THE COURT: Okay. What's that marked?

MR. SAXENA: Exhibit 1.

THE COURT: Defense Exhibit 1?

MR. SAXENA: Defense Exhibit 1. Defense Exhibit 2 is another body camera that I received from the government. It's the body camera of Agent Nunn, N-u-n-n. It's mislabeled in the government's discovery as Agent Dunn, D-u-n-n, but it's actually Nunn.

THE COURT: Typo.

MR. SAXENA: What's that?

THE COURT: These are a defendant Dunn?

MR. SAXENA: It's an Agent Nunn. There is no Agent Dunn.

THE COURT: Yeah, so it's a typo.

MR. SAXENA: Yeah. And Defense Exhibit 3 is the body camera of Agent Rivera from the government.

Defense Exhibit 4 is the body camera of Agent De La Mora also from the government.

Exhibit 5 is a still image from the body camera of Mr. -- sorry, Agent Nunn at timer 4:10.

Defendant Exhibit 6 is a still image from Agent Rivera's body camera at timer 2:50.

And then Defense Exhibits 7 and 8 are two citizenship and passport documents from the witness that I am going to call, and I produced those to the government before the hearing.

THE COURT: Okay. So Defense Exhibits 1 through 8, are they also on a thumb drive?

MR. SAXENA: Yes, they are, your Honor.

THE COURT: And that's separately printed or marked?

MR. SAXENA: They are not printed, your Honor, no.

THE COURT: Okay. And, Mr. Richards, have you seen Defense Exhibits 1 through 8?

MR. RICHARDS: Yes, your Honor. Counsel sent an email on Friday. It was labeled 1 through, I guess, 5, I think the -- two of the numbers, you just split them up. So I believe the government has seen all of them. The government was just not made aware of the witness that is going to testify by the defendant. However --

THE COURT: Wasn't there a --

MR. RICHARDS: -- the government believes --

THE COURT: There was a witness intent statement

filed.

MR. RICHARDS: Okay.

THE COURT: But I got a copy of it somewhere.

MR. RICHARDS: Notwithstanding that, in efforts for the judicial comm. [sic], the government has an idea as to what the substance of that witness will be.

THE COURT: So Docket Number 53 is defendant's responsive notice of intent to call witness. That was docketed on April 30.

MR. RICHARDS: That is correct. My mistake, your Honor. Just going off of --

THE COURT: Yeah, all right.

So at least as to Exhibits 1 through 8, any objections to the Court receiving those?

MR. RICHARDS: The only objections would be for the last two. I believe it's 7 and 8, the documents that contain PHI. Do you have any --

MR. SAXENA: They contain PII, your Honor. But they won't be publicly filed. They have personally identifying information on them.

THE COURT: Okay. Well, they are going to be filed, and the drive becomes public unless they are sealed. At the point you use them, you'll need to address that.

MR. SAXENA: I can provide the Court with a redacted version of those as well as the driver's license

information.

THE COURT: Okay.

MR. SAXENA: And the government will need to do the same for the database records that have been admitted. They all have personal identifiers on them that are not allowed to be publicly filed.

THE COURT: Yeah. Okay. Any objections to 1 through 8 then?

MR. RICHARDS: Well, the government's objection with respect to those two documents, your Honor, would be under relevance. There's extrinsic collateral evidence that relates to the identity of the --

THE COURT: Of the witness? The identity of the witness. These are citizenship documents of the witness, not of the defendant.

MR. RICHARDS: Understood, your Honor.

THE COURT: Yes. So it's just -- well --

MR. RICHARDS: The government submits the inquiry for the witness's reasonable submission is what they knew at the time. This is information that counsel submitted for a fact after. But that was not known to them.

MR. SAXENA: Your Honor, I think that -- a couple responses. One is, I think it will become clear the relevance of the documents after the hearing begins, and so I would be happy to make that argument as to the relevance.

THE COURT: All right. Let's -- Defense Exhibits 1 through 6. Any objections to that?

MR. RICHARDS: No, none, your Honor.

THE COURT: All right. Defense Exhibits 7 and 8 you can offer them at the time if you even feel the need to use them.

MR. SAXENA: Yes, your Honor. And they also go to credibility, so.

THE COURT: Yeah. But I mean, at this point you'll have to offer them.

MR. SAXENA: Okay.

THE COURT: No objection to the foundation for those documents though, right?

MR. RICHARDS: No, your Honor. And to the extent --

THE COURT: So it's simply a question whether it's relevant.

MR. RICHARDS: Yes. And if counsel's witness relates to the authenticity of that, the government would have no objection to the documents coming in as well.

THE COURT: All right. Just to recap then, the Government Exhibit 1, the thumb drive which contains Government Exhibits 2 through 6 have been accepted and admitted for purposes of this hearing. Defense Exhibits 1 through 6 have been accepted and admitted for purposes of

this hearing. Defense Exhibits 7 and 8 are, whether or not they are going to be admitted for purposes of the hearing, the Court has reserved a ruling on relevance at the appropriate time.

All right.

MR. SAXENA: Your Honor, I'm rethinking what I said about PII. We can address that later. But it was not my understanding that these items would be put on ECF.

THE COURT: Well, they won't be. But, you know, the court's docket is still a public record. And if someone come.

S in and wants to see it --

MR. SAXENA: Yes.

THE COURT: -- you know, unless there's a redacted version to produce to them --

MR. SAXENA: And I will just have to recheck the rules on what we do with those types of documents that are not on ECF. I was referring to the ECF rule.

THE COURT: Yeah, no. But, I mean, the public is actually entitled to come and see the physical evidence. Now, whether we allow them to handle firearms or narcotics, but it's still a matter of public record. So you need to -- since you both have exhibits on electronic files that have personal identifying information, you'll need to -- why don't you just meet and confer after this hearing about how

you're going to handle it and then send me a stipulation.

MR. SAXENA: That makes sense, your Honor.

THE COURT: Thank you.

MR. RICHARDS: Very well.

THE COURT: All right. Is the government ready to call its witness?

MR. RICHARDS: Yes, your Honor.

THE COURT: Go ahead.

MR. RICHARDS: United States calls Border Patrol Agent Marco Antonio Muniz.

THE COURT: Where is he?

MR. RICHARDS: Right outside the door.

THE COURT: Go get him.

MR. RICHARDS: All right.

(The witness enters the courtroom.)

THE COURT: Come to the deputy to be sworn.

THE COURTROOM DEPUTY: You do solemnly swear that all the testimony you are about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Okay. Once seated, please state your full name and spell your last name.

THE WITNESS: My name is Marco Muniz, M-u-n-i-z.

THE COURT: You may inquire.

MR. RICHARDS: Thank you, your Honor.

**(MARCO ANTONIO MUNIZ)**

**DIRECT EXAMINATION**

BY MR. RICHARDS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. How long have you served as a United States Border Patrol agent?

A. Four years and four months.

Q. In what capacity do you currently work?

A. On the U.S. Border Patrol.

THE COURT: Can you pull the microphone closer?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

BY MR. RICHARDS:

Q. What is your current assignment?

A. I'm currently assigned to collateral intel and my station.

THE COURT: Assigned to what?

THE WITNESS: Assigned to collateral intel.

THE COURT: Collateral insort?

THE WITNESS: Intel.

THE COURT: Intel?

THE WITNESS: Yes, your Honor.

THE COURT: Okay.

BY MR. RICHARDS:
Q. What are your roles and responsibilities within collateral intel?
A. It's to provide intelligence to agents on the line to facilitate -- to facilitate arresting smuggling attempts.
Q. You mentioned on the line. What does that mean?
A. Agents that are working on the river or in the checkpoint.
Q. You mentioned a river. Where do you currently work?
A. I work in Laredo, Texas, southern border.
Q. Now, prior to your --
THE COURT: Sorry. Just -- the river you're referring to is the Rio Grande?
THE WITNESS: Yes, your Honor.
THE COURT: Okay. Not the Rainy River?
THE WITNESS: No.
THE COURT: Okay.
MR. RICHARDS: Thank you, your Honor.
BY MR. RICHARDS:
Q. So prior to this assignment, did you hold another assignment within the Border Patrol Agency?
A. Yes, your Honor. I was in Minneapolis for a month.
Q. Was that specifically within the context of Operation Metro Surge?
A. Yes.

Q. And further I'll direct your attention to January 20 of 2026. Were you working that day?
A. Yes.
Q. Were you assigned to a, what's called a strike team?
A. Yes.
Q. What does that mean?
A. It was a group of us -- it was basically four to five trucks together. We were assigned to work together as backup for each other.
Q. You mentioned that was within Minnesota; is that correct?
A. Yes.
Q. About where?
A. Minneapolis. That would be the -- that day we were working in St. Cloud.
Q. Were you engaged or assigned to what's referred to as roving patrol operations or roving operations?
A. Yes.
Q. What are roving operations?
A. It's basically doing immigration, narcotics, or terroristic, enforcing laws in a vehicle in a specific area assigned to us.
Q. And pursuant to roving operations, are agents mobile?
A. Yes.
Q. On the move?

A. Yes.
Q. And you're actively observing vehicles, individuals, or circumstances for indicators relevant to immigration enforcement?
A. Yes.
Q. Do such roving operations require proactive field enforcement?
A. Yes.
Q. In other words, you're not in a fixed location as if you would be on the border at a checkpoint; is that correct?
A. No.
MR. SAXENA: Objection, leading.
THE COURT: It's getting there.
MR. RICHARDS: Understood.
BY MR. RICHARDS:
Q. Would that --
THE COURT: I mean, you know, some of it is preliminary, Mr. Saxena, but I understand.
Let's let the witness speak as much as possible.
MR. RICHARDS: Understood.
BY MR. RICHARDS:
Q. Would that require proactive fields observation?
A. Yes.
Q. How would that work?
A. We're observing, making observations based on our

experience or intel that we had gathered before.
Q. Now, as part of your training and experience within the Border Patrol Agency, have you received training specific to such field operations?
A. Yes.
Q. Have you been trained to assess vehicles?
A. It comes with the experience, yes.
Q. What about performing license plate checks?
A. Yes.
Q. And gathering additional information that may be deemed pertinent?
A. Yes.
Q. Now, with respect to license plates or vehicles, what type of information could be helpful in a roving operation?
A. You should get a return on the registered owner and then any criminal history or immigration status on them.
Q. You mentioned immigration status. What type of information could be provided?
A. Usually if they are out of status or they are here illegally in the United States.
Q. Are there additional officer safety alerts that may be notated?
A. Yes. We refer to them as TEXITs. It come back to a wanted person or an armed and dangerous or anything that could help the agent before making that vehicle stop.

Q. Now, just in general, sir, are you familiar with your authorities under Title 8 of the United States Code?
A. Yes.
Q. And does that authority permit you and other immigration officers to conduct field operations in the United States?
A. Yes.
Q. Are you further trained that when you're supported by specific facts that you may briefly detain, question or arrest individuals you believe are here unlawfully?
A. Yes.
Q. And does your authority apply only at the border or within the United States?
A. It could be within the United States.
Q. Are you familiar with what a reasonable distance from the border is as well?
A. Yes.
Q. And what does it that mean to you as a Border Patrol agent?
A. They have a reasonable 100-mile rule.
Q. And what does that mean?
A. We can enforce our duties within a 100-mile radius of the border.
Q. Now, with respect to these vehicle checks and license plate checks you referred to, do Border Patrol agents routinely use law enforcement databases?

A. Yes.
Q. What types of systems are you familiar with?
A. The Super Query is the one that we use to run plates of people, anything that we can find useful.
MR. SAXENA: I'm sorry, your Honor. I cannot hear the witness. I don't know if there's a way to turn up the volume.
THE COURT: Do you see the arrows to the right? Now try it.
THE WITNESS: Testing.
THE COURT: There you go.
MR. SAXENA: Thank you.
BY MR. RICHARDS:
Q. Sir, generally where does that information come from, or what's the source of the information?
A. It's a government database.
MR. RICHARDS: How is that?
MR. SAXENA: Much better, your Honor. Thank you.
THE COURT: Okay.
BY MR. RICHARDS:
Q. Now, when you say it's a government database, is that the entirety of all the records in the United States Government?
A. No.
Q. So in other words, is it limited?

A. Yes.
Q. Are you trained in the use of these systems?
A. Yes.
Q. Now, even if information could be updated at a later time, is it reasonable to rely on those systems in real time during field operations?
A. Yes.
Q. And have you done that?
A. Yes.
Q. And have you utilized such systems often during your time at the Border Patrol Agency?
A. Yes.
Q. Now, with that in mind, I'm going to direct your attention back to January 20 of 2026. Again, were you working in the capacity as a Border Patrol agent?
A. Yes.
Q. Specifically in the St. Cloud area of Minnesota?
A. Yes.
Q. Pursuant to your responsibilities that day, were you wearing any law enforcement indicia at all?
A. Yes. I was wearing my issued body armor with Border Patrol insignias and police in the back as well as my duty belt.
Q. Okay. Can you just describe where those items would be on your body as it would appear in the public?

A. Yes. I have a badge on the right-hand side where my heart is, in the middle where it says U.S. Border Patrol, in the back it says Police in yellow. All those marks are in yellow, and then my vest is green.
Q. Furthermore, you mentioned earlier you were working with a team that day; is that correct?
A. Yes.
Q. Were other members of your team also wearing physical or marked law enforcement indicia that day?
A. Yes.
Q. Now I'm going to further direct your attention to around 11:00 a.m. Did there come a time when you observed a white work van?
A. Yes.
Q. What caused you to take notice of this vehicle?
A. So prior -- I guess prior experience, we usually see a lot of workers that are here daily in the United States, or trades. Those trades are usually -- they were trades to get paid cash due to them not having a Social Security. And in that field we see a lot of vans, work vans, work trucks, traders with working equipment. So it got our attention because it was a work van.
Q. In your four plus years' experience as a Border Patrol agent, have you had instances where you've observed and investigated similar types of vehicles for that purpose?

A. Yes.
Q. And were you ever able to have any arrests based upon such information pursuant to your immigration enforcement authority?
A. Yes.
Q. Just generally describe how.
MR. SAXENA: Objection, your Honor. It's irrelevant.
THE COURT: Overruled.
But you're getting really close to being the source of all the testimony.
MR. RICHARDS: Yes, your Honor.
THE COURT: Yeah. All right. So do you want to ask him again?
BY MR. RICHARDS:
Q. Yes. Can you just -- can you describe how such information could be useful?
A. There are tactics, techniques and procedures that are pushed out to us pertaining to trends that can be useful to us. They might say that workers or people are using this to -- or that might be illegal immigrants based upon the history.
Q. Now, at the time you made these observations, where were you?
A. I was in St. Cloud in the truck, in a vehicle.

Q. Where were you seated within this vehicle?
A. I was the front passenger.
Q. Can you describe to the Court if other members were in the vehicle, other agents, where they were seated?
A. There was a driver. There were two people in the back seat.
Q. Now, after you observed this white van, based upon the information you just provided, did there come a time when a decision was made to follow this van?
A. We were going to run it first and see what we came up with to verify if people were registered to it were illegally here.
Q. Was in fact information ran?
A. Yes.
Q. How so?
A. We used Super Query. After we got some returns, we sent it up to a Teams chat on our government phone to people who were actually doing more in-depth research on the subject. And they came back with the subject -- with the Visa expired in 2007 and he was armed and dangerous.
Q. Now, let's just go step by step. You first mentioned that a Super Query was ran?
A. Yes.
Q. What is that?
A. A Super Query is basically a search on the license

plate. The license plate came back to a subject, and then we ran the subject to see what his immigration status is.
Q. What were the results of those searches?
A. He had a Visa expired in 2007. He was here illegally in the United States.
Q. Furthermore with respect to the registration, did it provide any information about this individual's identity?
A. Yes. It shows a picture, date of birth, name, and any other alerts that other prior agencies might have put on him.
Q. And you mentioned after this step was performed, an additional step was performed?
A. Yes. So once we got it back, we sent it up another -- the Teams chat just to verify the information.
Q. How would that verify the information?
A. We had people at that time running names, basically doing another search.
Q. Who do you mean by people?
A. It was a group chat among Border Patrol agents that were assigned to just that, running checks on people.
Q. And what do you mean by running checks?
A. Basically just checking their immigration status, any other criminal activity that they might have had, or wants and warrants.
Q. Did you follow that process as you just described to the

Court that day?
A. Yes.
Q. And what were the results of that process?
A. They came back positive for a subject who was here illegally in the United States, a Visa overstay, and he had an alert for armed and dangerous.
Q. Now, based upon your training and experience, where or why or what would be the reason for such an alert for armed and dangerous?
A. Prior encounters with other agencies. They might put an alert or within the same agency as well, depending on their previous experience with him.
Q. Upon receiving all that information you just described, what, if anything, happened next?
A. We saw the subject get out, so we decided to wait for him to come back.
Q. Where was this?
A. This was in an apartment complex. He got off at the apartment complex, went inside. There was another subject in the vehicle waiting for him, so we decided to wait for the subject to come back to his truck.
Q. Where were you waiting?
A. We were parked about ten vehicles away from that car. When he came back to the truck, we approached him, parked maybe like 5, 10 feet away from the front of his car.

Q. What happened next?
A. Myself and the two agents that were in the back passenger's side -- or seats, we got off, we said U.S. Border Patrol, and the subject saw us, and he started acting erratically, saying "no." He got in the truck and put it in reverse and left.
Q. So, why don't you just walk through that again. Does there come a time when you exit your vehicle?
A. Yes.
Q. Do other agents also exit the vehicle with you?
A. Yes.
Q. Now, you mentioned you were in the front passenger's seat; is that correct?
A. Yes.
Q. Were you facing the defendant's vehicle or --
A. Yeah.
Q. -- was your front --
A. We were facing the defendant's vehicle.
Q. And just can you walk through how it is you were able to observe this individual?
A. He was really close to us, so we were able to see his face compared to the picture that we had gotten before.
Q. And what, if anything, were you able to notice about this individual's appearance as it related to the photograph you previously described?

A. We believed it was the subject we were looking for.
Q. How so?
A. Similar appearance.
Q. How close were you when you made those observations to this individual?
A. Maybe from where that stand is to where I'm sitting now. (Indicating.) Ten feet or about.
Q. Let the record reflect the witness indicated; he said ten feet.
Was anything obstructing or blocking your view at the time of these observations?
A. No.
Q. And you were able to see this individual?
A. Yes.
Q. And he was able to see you?
A. Yes.
Q. And you mentioned -- when you exited your car and you saw him, what, if anything, did you or other agents say?
A. We presented ourselves as U.S. Border Patrol.
Q. What do you mean by that?
A. It's just to identify ourselves besides our insignias and our vest.
Q. Were you still wearing all the same insignia that you described earlier?
A. Yes.

Q. What, if anything, did this individual do in response to you identifying yourself?
A. He saw us, he started screaming "no," he got in the truck, and he kept on screaming "no" after we told him to stop.
Q. And during these interactions as he's screaming at you, are you even closer to him than you were when you first saw him?
A. Yes. At that point we were about five feet.
Q. Were you able to further look at this individual's face?
A. Yes.
Q. And again, how did that compare to the photograph you previously referenced?
A. We believed it was the subject we were looking for.
Q. And did this individual comply with any requests at that time?
A. He did not comply.
Q. What happened?
A. He put the van in reverse and took off.
Q. What, if anything, did you and members of your team do in response?
A. We decided to follow to see where he was going.
Q. How so?
A. We were -- we drove in back of him. We observed the vehicle from afar at first.

Q. What, if anything, happened during the time you followed this vehicle?
A. We noticed he kept on running traffic signs, stop signs. He wasn't driving the way a normal person would drive.
Q. Did there come a time when your vehicle and that vehicle crossed intersections?
A. Yes.
Q. How would you describe the vehicle's driving crossing intersections?
A. He did not comply with the stop sign.
Q. Now, based upon your training and experience, did it appear this vehicle was attempting to evade?
A. Yes.
Q. Did the driving create a risk to public safety at that time?
A. Yes.
Q. After those observations, what, if anything, happened?
A. The driver continued. Eventually we got close to the truck, and he was close to hitting us on the driver's side. The driver of our vehicle was able to evade it. But then somehow he got behind us and to the right side of us where the passenger's side is of our vehicle, and he rammed into the front side of the truck.
Q. So just to get this straight, the van was to the left of your car?

A. Yes --
Q. And then --
A. -- in the beginning. He was going to crash into us, so the agent driving our vehicle maneuvered to the right side and evaded the first attempt to hit us. He got the -- eventually he became -- he got to the right side of our vehicle, and he hit us on the right side front door, front wheel.
Q. Did you observe the vehicle crash into you?
A. Yes. I was on the passenger's side, so I was -- I was able to see him through the impact.
Q. What did you say?
A. I don't recall what I said, but I felt the impact, and I saw the -- I saw the mirror.
Q. What mirror are you referring to?
A. The side mirror on the right side.
Q. It fell off or was not in the position it was before the impact?
A. Yeah. It was dangling or hanging from a wire.
Q. What happened next?
A. The white van went over the median. We stopped. The van went over the median and drove the other way. Two agents were attempting to perform a stop there, and they had to get out of the way to avoid getting hit. The van kept on going.

Q. So after this van crashed into your vehicle on the front passenger's side, what happens with your vehicle?
A. We kept on going after.
Q. And where did this van go?
A. Into a suburban area, I believe.
Q. You mentioned something about going across the median or over a median?
A. Yes. The van drove through the median and started going the opposite way.
Q. And you mentioned that there were other agents --
A. Yes.
Q. -- down the road?
A. At that point, we had to called for backup. They were attempting to back us up.
Q. And what did you observe, or what happened?
A. From my point of view, it looked like they had to get out of the way to avoid getting hit by the van. It was two agents.
Q. What happened next?
A. We continued to follow the van after he attempted to run over the agents. Eventually we got to a stop sign, and we were able to perform a box-in.
Q. Now, what do you mean by a box-in? What does that mean?
A. It's a maneuver where we get in front of the truck, and another vehicle gets in back of the truck so that they can

stop the truck from fleeing.
Q. Is that a tactic that's commonly used to stop a vehicle?
A. Yes. We're trained for it.
Q. How so?
A. At the academy we got the training for it.
Q. And what's the purpose of this maneuver?
A. To stop the vehicle from fleeing.
Q. And was this particular maneuver performed?
A. Yes.
Q. How so?
A. The driver got across the truck, and there was another driver, another agent in the back of it.
Q. Was it successful?
A. Yes. We were able to arrest the subject.
Q. So did there come a time when the van stopped because of the maneuver?
A. It -- we got off. We arrested -- or we took out the drivers, and we noticed the truck, the white van, kept on going. One of our doors was open, and it hit the door again.
Q. What door was that?
A. The back side on the passenger's side, back passenger door.
Q. Now, you mentioned that somebody was arrested after this successful maneuver was performed; is that correct?

A. Correct.
Q. Who was arrested?
A. We detained -- we arrested the driver, and we detained the co-driver.
Q. Now, with respect to the driver, I'm just going to ask you to look around the courtroom today and see if you recognize that individual.
A. Yeah. It's the subject wearing the yellow shirt behind you.
Q. Okay. You recognize that individual as the driver?
A. Yes.
MR. RICHARDS: Okay. Your Honor, let the record reflect the witness identified the defendant.
THE COURT: It may.
BY MR. RICHARDS:
Q. Now, thereafter did you have an opportunity to observe the damage further with respect to your vehicle?
A. Yes.
Q. Can you describe further what you observed now that you were outside the vehicle?
A. The front grill was gone. There was a big hit on the right side where -- the tires on the passenger's side. The mirror was still hanging from a wire, and the door was off the rail. We couldn't close the door at the beginning.
Q. And based upon your experience, is that consistent

with -- or the damage you observed, was that consistent with being struck by the defendant's van?
A. Yes.
Q. And did you further have an opportunity to observe the defendant's vehicle, the white --
A. Yes.
Q. -- van? And what, if anything, did you observe?
A. The front -- the front passenger's side -- no, the front driver's side had damage to it.
Q. And how did that area of damage -- or excuse me. How did the damage area relate to where you were impacted, your car was impacted by the defendant's car?
A. It correlated with our damage from the truck.
MR. RICHARDS: Your Honor, with the Court's permission, at this time the government would like to show the witness what's been moved into evidence.
THE COURT: Which one?
MR. RICHARDS: We'll start with Exhibit 2 in evidence.
THE COURT: Okay.
MR. RICHARDS: Thank you.
Let the record reflect Government Exhibit 2 is being published to the Court and the witness.
BY MR. RICHARDS:
Q. Sir, I'm just going to direct your attention to the

monitor. Do you recognize what's depicted here?
A. Yes.
Q. And what is this?
A. That is what we got as returned when we ran Super Query on the vehicle, on the white van.
Q. And what information is included there?
A. It includes the name, date of birth, and citizenship.
Q. Further in the middle, is there a photograph there?
A. Yes. There's a photograph and armed and dangerous alert on top.
Q. And with respect to that photograph, is this the same photograph you reviewed?
A. Yes.
MR. RICHARDS: Government Exhibit 3 is now being published for the Court.
BY MR. RICHARDS:
Q. Sir, I'm just going to direct your attention now to the monitor again. Do you recognize what's depicted here?
A. Yes.
Q. And can you describe to the Court what you see?
A. It seemed the subject had a document, a Visa expired in 2007, and the armed and dangerous is still there.
Q. Now, armed and dangerous, is that depicted on top in red and white color?
A. Yes.

Q. And you mentioned information about this individual's immigration status. Can you just describe specifically where on this image you're getting that information from?
A. Yes. The document expiration date, it says December 1, 2007.
Q. And how were you aware as to what kind of document this is?
A. We perform a lot of these at the checkpoint and are back home when we're performing our duties. This is --
Q. And what about the -- I'm sorry.
A. Sorry. This is a refugee travel document reentry. At one point he had a Visa for it. The government removed it in 2007 or '8.
Q. Can you just repeat that one more time?
A. Yes. It got expired in 2007.
Q. And you mentioned that you are familiar with this information in addition to what's depicted here based upon work at the checkpoint. What do you mean by that?
A. Yes. Every day we're at the checkpoint, we run Super Queries on individuals as well that we secondary -- based on immigration status.
Q. What checkpoint are you referring to?
A. Del Rio, Texas. Charlie 29 checkpoint on 35, I-35.
Q. This predates January 20 of 2026, your involvement at the checkpoint?

A. Yes.
Q. How long did you work there for?
A. Three years, four years in total.
Q. If you could put a number on it, approximately how many of these query searches did you perform or assist with?
A. Probably hundreds of Super Queries that we've done, myself.
Q. And based upon all of that experience, that led you to believe that the information depicted in this query search includes what you call Visa overstay from 2007?
A. Yes.
MR. SAXENA: Objection, your Honor, leading.
BY MR. RICHARDS:
Q. I'll rephrase.
Based upon the information described, again, what does this information indicate to you?
A. He's been over here since 2007.
MR. RICHARDS: And I'll just let the record reflect what's labeled Digital File Government Exhibit 4 is being published to the witness.
In relevant part, your Honor, we're going to -- this clip is about ten minutes in length, and it will be forwarded to about one minute and 40 seconds. And it is equipped with video and audio for the Court.
So let the record reflect it is now being

published from a minute and 40 seconds in.

(The video without audio is played.)

BY MR. RICHARDS:

Q. I'm going to pause it at 1:54. I'm going to back up to about a minute 50. What, if anything, do you recognize about this particular clip?

A. That was when he ran into us the first time.

Q. Specifically, we'll go back to just a minute 17 here, and we'll stop -- let the record reflect the exhibit stopped at a minute 48. Sir, what's depicted here?

A. The subject ran into us.

Q. Where was the defendant's vehicle depicted here?

A. He's in the front -- that's where he hit us in the front.

Q. What part of the screen is that?

A. The bottom screen, bottom right side.

MR. RICHARDS: Let the record reflect the witness indicated that the defendant's vehicle at a minute 48.

BY MR. RICHARDS:

Q. I'm just going to go forward a little bit to there, that last second. Were you able to observe your side-view mirror at that time?

A. Not anymore.

Q. What happened to it?

A. He busted it, and it was hanging.

Q. So no longer visible?
A. No longer visible.
MR. RICHARDS: Let the record reflect that exhibit is no longer being published.
Exhibit 5 in evidence is being published at this time.
BY MR. RICHARDS:
Q. Sir, do you recognize what's depicted here?
A. Yes. That was our vehicle at the time of the incident.
Q. What does it depict afterwards?
A. That's after the crash. That was damage to our vehicle.
Q. And what -- can you please explain what portion of the vehicle is prominently displayed here?
A. Yes. It's the front right side tire. You could see the mirror hanging from the wire, the front grill is gone, And half of it is busted in front.
Q. And based upon your experience as you personally observed it, is this the same area where the defendant's van struck your car?
A. Yes.
MR. RICHARDS: Lastly, let the record reflect Government Exhibit 6 is being published.
BY MR. RICHARDS:
Q. At this time, sir, I'll direct your attention to the monitor. What is depicted here?

A. That is the damage the vehicle -- the white van caused on himself.
Q. Go back. What vehicle is depicted there?
A. That is the white van that hit us.
Q. And do you observe any damage on it?
A. Yes, on the right side driver -- left side on the driver's close to the headlights.
Q. What about the headlights?
A. The headlight is falling off. That's where he hit us.
MR. RICHARDS: Let the record reflect that that exhibit is no longer being published.
With that in mind, your Honor, the government has no further questions.
THE COURT: Cross?
MR. SAXENA: Yes, your Honor.

CROSS-EXAMINATION

BY MR. SAXENA:
Q. Good afternoon, Agent Muniz.
A. Good afternoon.
Q. We've never met before, correct?
A. No, sir.
Q. Okay. First, do you have a clear memory of the events of January 20 sitting here today?
A. Yes.
Q. Anything affecting your ability to remember those events

clearly?
A. No.
Q. Okay. I want to start very general based on the testimony that you just gave, and you correct me if this statement is wrong. But on that day, in general, you and your colleagues approached the defendant while he was driving a van, correct?
A. He was not driving the van.
Q. He was in the van, correct?
A. He was walking.
Q. Okay. We'll get back to that. But you approached him in an attempt to arrest him, correct?
A. No. We were going to perform an immigration inspection.
Q. Which would have involved what?
A. Ask him for his status.
Q. Okay. And then after he -- in your testimony, after he got into the van and drove away, later on you and your team arrested him, correct?
A. Eventually, we arrested him, yes.
Q. Eventually, you got him out of the van and arrested him, correct?
A. Yes.
Q. And that was an arrest that was conducted without a warrant, correct?
A. That was an arrest based on the assault to an agent,

yes.
Q. And it was based on your belief that there was probable cause to arrest him?
A. We had reasonable suspicion, yes.
Q. Okay. That's your understanding?
A. Yes.
Q. Okay. And that happened after the squad video that we just looked at, correct, after all the events that occurred on the squad video?
A. Yes.
Q. Okay. And then after that, you and your team put the defendant into a Chevy Suburban and drove him down to the Whipple Federal Building?
A. Yes.
Q. Okay. And at that point he was put into a cell, correct?
A. At that point we turned him over to the people there.
Q. Okay. You did not stay with him at that time?
A. No.
Q. Okay. You left the facility?
A. Yes.
Q. Okay. All right. Thank you for that.
On January 20 then, after you dropped him off at the Whipple Federal Building, you were interviewed by DHS agents?

A. HSI agents, yes.
Q. HSI agents? Where did that occur?
A. At the Whipple Building.
Q. Okay. How long after the events that we just talked about did that interview occur?
A. We had to wait before we left the building. Maybe about 20 minutes after.
Q. Okay. Did you review anything related to this incident before you were interviewed?
A. We looked at our body camera video.
Q. Okay. So you -- when you say we, who are you referring to?
A. Everybody viewed their own camera.
Q. Did you talk to your fellow agents before you and they were interviewed by HSI?
A. Not about the incident.
Q. You did not talk to them about your statement that you were about to make?
A. No.
Q. Okay. But you had reviewed your own body camera footage?
A. Yes.
Q. What's your understanding -- or who do you understand was actually interviewed as part of this incident? Can you list those agents for me?

A. Not off the top of my head. I don't recall who was interviewed.
Q. Do you know any of the agents that were interviewed other than yourself?
A. We all met here. I don't -- I know who they are.
Q. Do you know the names of any of the agents that were interviewed?
A. Yes.
Q. And which agents do you know by name who were interviewed along with you?
A. That were in the truck with me or that were interviewed?
Q. Just the people that were interviewed by HSI. That's what I'm asking about now.
A. Angel Flores is one of them.
Q. Okay.
A. An Agent Nunn is another, and an Agent Ortiz is another.
Q. Okay. Did you review those interviews or the recordings of those interviews before your testimony today?
A. No.
Q. What did you review in preparation for the hearing for today?
A. Just my body-worn camera.
Q. Okay. Did you review the statement that you gave to HSI on January 20?
A. No.

Q. Did you review the statement that any other agent gave to HSI on that date?
A. No.
Q. What else did you -- sorry.
What else did you do to prepare for the hearing today?
A. I just received a call from the gentleman here. He just told me what was going to happen.
Q. Okay. And did you have a conversation with the prosecutor about your testimony today?
A. Yes.
Q. Okay. And did you prepare for your testimony during a communication with the prosecutor?
A. Yes.
Q. You did that over the phone?
A. Yes.
Q. Okay. And did you talk to anyone else about your testimony today?
A. No.
Q. Okay. So no one else from HSI, correct?
A. No.
Q. No one from DHS?
A. No.
Q. And no one from Border Patrol?
A. No.

Q. Okay. And you haven't reviewed any other reports related to this?
A. No, sir.
Q. And you didn't review, for example, Government Exhibit, I believe it was 3, which had the CIS query information on it?
A. No.
Q. You didn't review that before the hearing?
A. Before the hearing, yes. I saw the image.
Q. Okay. So I'm going to ask you again, what materials did you review in preparation for the hearing today?
A. Just what was presented.
Q. What was presented to you by the prosecutor?
A. Yes.
Q. Okay. And what did the prosecutor send you in preparation for the hearing today?
A. What he -- what? I'm sorry.
Q. What did the prosecutor send you for you to review in preparation for the hearing today?
A. He didn't send me anything.
Q. Okay. I'm -- maybe I'm asking a bad question. But I just want you to list all of the items that you may have reviewed, listened to, or otherwise taken a look at in preparation for your testimony today.
A. All the items were the exhibits he presented earlier.

Q. Okay. So you looked at every single government exhibit before your testimony today?
A. Yes.
Q. And nothing else?
A. Just the ones that were presented right now.
Q. Okay. And you haven't looked at anything else or listened to anything else before your testimony today?
A. No.
Q. Okay. All right.
THE COURT: I think the confusion is chronological. Ask when he looked at Exhibits 2 through 6.
BY MR. SAXENA:
Q. When did you look at those exhibits before today?
A. Before today?
Q. Yes.
A. Never.
Q. Okay. So the only time you've ever seen those exhibits is today?
A. Yes.
Q. And prior to today, the only material you have reviewed in preparation for the hearing is your body camera footage?
A. Yes.
Q. And you've looked at that twice?
A. Yes.
Q. Okay. Once on January 20, correct?

A. Right.
Q. And then when was the next time?
A. Maybe about two days ago.
Q. Okay. Have you reviewed any of the pleadings in this case, like the charging document or any of the motions that have been filed?
A. No, sir.
Q. Okay. All right.
Do you have an understanding of what Mr. Jama is charged with in the case?
A. No.
Q. You don't. Okay. And you were not involved in the decision to charge him?
A. No.
Q. Okay. All right.
You talked about your training, and you said that you've been a Border Patrol agent for four years. Have you been trained in vehicular pursuits?
A. Yes.
Q. Okay. And you were being asked questions about whether the white van was causing a danger to the community, right?
A. Yes.
Q. And the reason that those questions are being asked is because part of the DHS vehicle pursuit policy is to assess whether there's a danger to the community associated with

agents deciding to pursue a vehicle, right?
A. Yes.
Q. That's something that you should have assessed before you pursued the vehicle, right?
A. We did not pursue. We followed.
Q. You were not engaged in a vehicular pursuit. Is that your testimony today?
A. No.
Q. You were not?
A. We were not.
Q. Okay. Let's get back to that.
I want to back up. So what vehicle were you in during this incident?
A. I believe it was a Chevrolet Suburban.
Q. A black Chevy Suburban?
A. I don't recall the color. I believe it was black.
Q. Okay. The video would tell us what color it is, right?
A. Yes.
Q. Okay. And you were with three other agents, right, in that car?
A. Yes.
Q. Okay. And you were the front side [sic] passenger, correct?
A. Yes.
Q. Agent Flores was the driver, right?

A. Yes.
Q. Who was in the back seat?
A. I believe it was Agent Nunn and Agent Ortiz.
Q. Okay. And which sides were they on?
A. Agent Nunn was on the left side behind Angel, and Agent Ortiz was behind me.
Q. Okay. And you all were following this white van before it ever parked in an apartment complex parking lot, right?
A. Yes.
Q. Okay. You were following the van because, as you testified, you thought it was a work van, right?
A. Yes.
Q. And you thought it was relevant to follow a work van because of your experience in Texas, right?
A. Based on the -- yes.
Q. All of your experience --
A. Right.
Q. -- as a Border Patrol agent other than this one-month time period in St. Cloud is based upon patrolling the border, the Mexican-United States border in Texas, right?
A. On January 3rd -- 20th, I had already had a few days here, so based on my experience with that, too.
Q. What day did you arrive in Minnesota?
A. I believe it was January 11.
Q. Okay. And what -- how many days did you patrol in

St. Cloud, Minnesota?
A. Since January 11.
Q. Okay. Every day was in St. Cloud?
A. Not St. Cloud. We were assigned to different areas in Minnesota.
Q. How many days did you patrol in St. Cloud, Minnesota?
A. That was our second day.
Q. Okay. So you had one day of experience in St. Cloud, Minnesota, before this incident, right?
A. Regarding St. Cloud? Yes.
Q. Okay. And you have no experience with the prevalence of undocumented or illegal immigrants driving around in white work vans in St. Cloud, right?
A. I believe it's the same everywhere, not just here in Minnesota.
Q. And you're saying that based on your opinion or based on your experience?
A. Based on my experience.
Q. Which is in Texas?
A. Texas and Minnesota.
Q. For one month?
A. Yes.
Q. Okay. And St. Cloud is not within 100 miles of a U.S. border with another country, correct?
A. I'm not too sure.

Q. You don't know how far away it is from the Canadian border?
A. No. They told us to go and patrol there, so I'm assuming they -- it's above my pay grade.
Q. Who told you to go and patrol there?
A. Our supervisors.
Q. Who is that?
A. Blackburn, Supervisor Blackburn.
Q. And what is Supervisor Blackburn's first name?
A. I don't recall.
Q. Okay. And is that somebody from -- that came here from Texas?
A. He was patrolling -- no. He was assigned to other operations. I believe he was in Chicago before that and then Charlotte.
Q. Okay. And he told you or your supervisors told you to focus on, quote, soft targets, right?
A. Soft targets meaning?
Q. Well, I guess it's my question for you, you know that your colleagues described your operation as a soft target operation, right?
A. So a soft target means you run the plates, and if the plate comes back to a person or if you run the plate to -- you run the person that comes back to those plates, and then you verify their status.

Q. Okay. And so you didn't have any one -- any particular individual that you were targeting for arrest for an immigration offense, right?
A. Not at that point.
Q. Okay. You were just looking for people to arrest, right?
A. We were doing our duties, yes.
Q. You were looking for people to arrest?
A. Yes.
Q. Okay. And how many people did you arrest that day?
A. I don't recall.
Q. Okay. When you were following that van, could you see the driver and the passenger of the van?
A. Yes, through their rearview mirrors.
Q. Okay. And you could see that they were -- you could see their skin color, right?
A. Yes.
Q. Okay. You couldn't see their faces, right?
A. At the beginning, yes, I saw their faces.
Q. Okay. So you saw their faces?
A. When we approached them, yes.
Q. Okay. When you were following the van before it parked, could you see their faces?
A. No.
Q. Okay. But you could see their skin color?

A. No. We weren't able to see them until we were following them after they took off.

Q. Okay. Well, let's go through that in a little bit more detail. So did you run the plates of that vehicle while you were following it around before it parked in the parking lot?

A. Yes. We -- I wouldn't say following. We were about to leave the parking lot when they pulled into the parking lot.

Q. Okay. So would you disagree with Agent Nunn if he described the situation as you all following that work van before it parked?

A. No. Like I said, we were about to leave, and we saw the truck, so we followed it back to the parking lot, I believe still following, I guess.

Q. Because you thought it was a good soft target, right?

A. Yes.

Q. That's what you testified to today. You were trying to find a way to stop that vehicle because it was a work vehicle.

A. Yes.

Q. And that was your sole basis for initiating contact with that vehicle, right?

A. No. We were trying to run the plates to see who the truck would come back to.

Q. So the vehicle is driving on the road, and you were

following it. It pulls into a parking lot and parks, right?
A. Yes.
Q. And at that time you had already run the plates of the vehicle, right?
A. At that time we're still running or doing our research on it.
Q. How long did it take you to complete your research on the vehicle plates?
A. Once we sent it, it took about maybe three minutes, four minutes.
Q. Okay. And during that time, the vehicle parked, correct?
A. Yes.
Q. And the individual that you ended up arresting later got out of the vehicle, right?
A. Yes.
Q. And you watched that person get out of the vehicle, right?
A. Yes.
Q. Okay. And you've already identified the person who got out of the vehicle as the defendant, correct?
A. Yes.
MS. LOPEZ: Okay.
Your Honor, I would ask the defendant to stand up if that's okay.

THE COURT: Sure.

BY MR. SAXENA:

Q. So this is the person you saw, correct?

A. Yes.

Q. The defendant who is standing up in court?

A. Yes.

Q. And you saw him in broad daylight walking between a vehicle and an apartment complex, right?

A. Yes.

Q. And you have four years of law enforcement experience, correct?

A. Yes.

Q. And as a law enforcement officer, one of the first things that you're supposed to observe is somebody's height, right?

A. Yes.

Q. And you would agree with me that the defendant is a very tall individual, correct?

A. Yes.

Q. And so you knew that he was a very tall individual as soon as he got out of the car, right?

A. Yes.

Q. You also saw that he's wearing glasses, right?

A. Yes.

Q. And he was wearing glasses that day, correct?

A. I don't recall if he was wearing glasses that day.
Q. The video will tell us, right?
A. Yes.
Q. Okay. All right. And you noticed those things about him, correct?
A. I noticed his height, yes.
Q. And you noticed his glasses, right?
A. I don't recall the glasses.
Q. Today you don't?
A. I don't recall the glasses.
MR. SAXENA: Okay. You can sit down. Thank you.
BY MR. SAXENA:
Q. All right. So I'm going to show you what I believe the government marked as and admitted as Government's Exhibits 3 and 4. Can I have Government's Exhibits 3 and 4 in the same document here? And we're going to go through this piece by piece.
Will you agree with me that these are the two government's exhibits that --
THE COURT: So.
4 is the video.
MR. SAXENA: I apologize, your Honor.
THE COURT: So you mean 2 and 3?
MR. SAXENA: It's 2 and 3, your Honor.
BY MR. SAXENA:

Q. Agent Muniz, will you agree with me that this is Exhibits 2 and 3?
A. I believe so, yes.
Q. Okay. And it's two separate pages, right?
A. Yes.
Q. Okay. Now, what I'm curious about here is this is a photograph of a cell phone, right?
A. Yes.
Q. Whose cell phone is depicted in this photograph?
A. Took all of our phones. I believe -- I don't recall who it was. We were all using all of our phones.
Q. So this is not your phone?
A. I'm not too sure.
Q. Did you take the photograph?
A. Not too sure if it was me. I don't think it was me.
Q. Do you know when the photograph was taken?
A. January 20.
Q. What time?
A. It should say there. 11:20.
Q. Okay. The cell phone that is inside the photograph says 11:20. And then the top part has another time or what looks like a time, and it says 2:55, so do you know what that signifies?
A. That it got screenshotted or sent up at a later date for evidence.

Q. So in fact what this is is somebody took a photograph of a cell phone, right? And then they sent it to somebody else who took a screenshot of the photograph on their phone, right?
A. Right. So I believe they sent a picture of the query to the government, the Team chat that I mentioned just to verify. I believe that's how they got the picture of the cell phone.
Q. Okay. So you're here today to testify, but you did not run this check?
A. Yes, we all did. Or I believe I did and Agent Flores did as well. Agent Flores was the one who sent up the picture, I believe, to the Teams chat on the government phone.
Q. Why did you have to send this picture to the Teams chat?
A. Just to verify.
Q. What? To verify what?
A. Immigration, and if he was still -- if it was still active.
Q. Okay. And what did you receive back on this Teams chat?
A. I believe Agent Flores received the information on his phone, and if I remember correctly, he said it was -- he was good target. He was a good target.
Q. He was a good target?
A. Yes.

Q. And that was the information that you had at the time?
A. Yes.
Q. That Agent Flores verbally told you he was a good target?
A. He confirmed it was the subject of one.
Q. He confirmed what?
A. That it was the subject that we were looking for on the picture.
Q. Who was the subject you were looking for?
A. That the subject in the -- the subject on the query, that it was still -- we were still looking for him, like it was still good. Like if the subject matched the description, it was him.
Q. Okay. Let me ask you this a different way. You're here to testify today.
A. Yes.
Q. Did you personally make a determination that the defendant was the person whose photo you were looking at before you tried to stop him?
A. Yes.
Q. Okay. So you had a photo in front of you?
A. Yes, that --
Q. Was it this photo?
A. Yes.
Q. Is this the only photo you had in front of you?

A. Yes.
Q. Had you personally determined for yourself that you believed that the individual in this photo was in the United States illegally?
A. Yes.
Q. And was that based exclusively on the information that is in this exhibit? And I can make it smaller if you want to look at it.
A. Yes. And they also confirmed from somewhere else on the Teams chat.
Q. And you don't know who that was?
A. No. There was multiple people sending different people on that chat.
Q. Okay. And we have no record of that, right?
A. It's on our government phones.
Q. Okay. But you did not provide it to the prosecutor when the prosecutor asked to you provide everything related to this incident to him, right?
A. I was not asked to provide my phone, no.
Q. You were not asked to provide everything related to this incident?
A. Not my -- not my government phone.
Q. You weren't asked to provide any information on your government phone?
A. No.

Q. And you did not provide the Teams chat?
A. No. And I believe I was not on that Teams chat. I believe the reason Agent Flores sent it was because he was the only one on that Teams chat at that time.
Q. Okay. And so you have not seen the Teams chat that you know of?
A. Yes. I've seen the Teams chat on his phone.
Q. He showed you the Teams chat?
A. On Angel Flores' phone, yes.
Q. Okay. And I will represent to you I don't have any Teams chat. So you understand that that is important to your decision to stop the individual, correct? Because you brought it up.
A. I mean, the only thing that the Teams chat would send is it was still active.
Q. What was active?
A. That he was -- his Visa was expired. That there was no change in this basically, that there was no change on what we were seeing in front of us.
Q. Okay. So let's go through this, and you let me know if you need me to make it bigger or smaller. I apologize that there's this big header on top. At the top, it says CIS query. What is CIS?
A. It's a part of Super Query. CIS, I believe, is where they get the picture.

Q. Okay. So in your training and experience as a Border Patrol agent, have you learned about the CIS system, which is kept by formerly Immigration and Naturalization Service and then DHS?
A. Yes.
Q. And CIS, and you correct me if I'm wrong, but CIS contains all documentation regarding anyone who has had interactions with formerly INS or currently Department of Homeland Security, correct?
A. It contains some, yes.
Q. Well, it contains --
A. Whatever we share with them, yes.
Q. Any Visa information, right?
A. Right.
Q. Any attempts to unlawfully enter the United States, correct --
A. Right.
Q. -- if they are caught, correct?
A. Right.
Q. It contains all citizenship information for all individuals, correct?
A. Yes.
Q. And it should also contain -- well, sorry. It should contain all citizenship information for all individuals who are naturalized, correct?

A. Yes.
Q. So if somebody arrives here in a refugee status and then becomes a naturalized citizen, CIS has that information in it, correct?
A. If it was shared with them, yes.
Q. If it was shared with who?
A. With the system. If the system was updated.
Q. Okay. But CIS is designed to hold all naturalization information, correct?
A. I wouldn't be too sure on that.
Q. Okay. But you have a lot of experience with CIS, correct?
A. I've used it a few times, yes.
Q. You know that it contains naturalization information, right?
A. Yes.
Q. Okay. Looking back at the exhibit, at the top it states "1 of 3." Do you see that?
A. Yes.
Q. And then if you look at the next exhibit, that also says "1 of 3," right?
A. Yes.
Q. Okay. And someone took this photograph of this cell phone, but it was not you, correct?
A. Not that I remember.

Q. You don't remember whether you took this photograph?
A. I don't think I took the photograph.
Q. Okay. At the bottom of the cell phone portion, do you see that?
A. Yes.
Q. The line? And it cuts off document information. Do you see that?
A. Yes.
Q. Okay. And then if we look at the next page, which is Government Exhibit 3, document information does not show up at the top of this page, right?
A. No.
Q. So we cannot tell from this photograph whether there's anything missing between the first exhibit and the second exhibit, correct?
A. I believe it's just because it's scrolled down.
Q. But you didn't take the picture?
A. No, but I've seen it. I ran the checks myself, too.
Q. So your testimony is there's nothing missing?
A. Not to my knowledge.
Q. But you didn't take the picture?
A. No.
Q. Okay.
A. I was not the only one who ran the checks. Everybody has access to that on their phones.

Q. Okay. And then at the bottom of this, which I believe is Government Exhibit 3, there's also some language there that's cut off at the bottom, correct?
A. Where it says Residence Data [sic].
Q. It says "Residence Date" right there. Do you see that?
A. Yes.
Q. Okay. And that's the end of the exhibit that the government offered into evidence, correct?
A. Yes.
Q. So we don't know what's below "Residence Date," right?
A. Right.
Q. And both pages, first page and second page, they both say "1 of 3," right?
A. Yes.
Q. That's because there was three records, right?
A. Yes.
Q. And we only have a picture of one of them?
A. Yes.
Q. And we don't know if that record is even complete, right?
A. Yes.
Q. Okay. And we don't know when this photograph was taken, right?
A. Not to my knowledge.
Q. Okay. So what could have happened here is that someone

on the scene saw a lot of different CIS records, but the only one that was produced to us was a selected set of images that were taken at 2:55 p.m., right?
A. Yes.
Q. Okay. And based on the information that you had from the Teams chat that was relayed to you by Agent Flores --
A. Yes.
Q. -- and based on your review of some records, you all decided to stop the defendant, right?
A. Yes.
Q. So he had gone inside the apartment complex, right?
A. Yes.
Q. You saw him in broad daylight, right?
A. Yes.
Q. He came out of the apartment complex how long later?
A. Maybe like five minutes after.
Q. Okay. So you had about five minutes while he was inside, right?
A. Yes.
Q. You had as much as five minutes while you were following him to the parking lot, right?
A. I'm sorry?
Q. Before he went into the apartment complex, you had been following the vehicle for about five minutes?
A. I'm not too sure how long we were there.

Q. Okay.
A. I think it was very quick. We were leaving the apartment complex when we spotted the truck.
Q. Okay. And during that time, no one ever ran any driver's license information for the individual that's in that Super Query exhibit, right?
A. What do you mean?
Q. Well, so you've talked about running the plates, right?
A. Okay.
Q. You ran the plates?
A. Yes.
Q. Personally?
A. Yes.
Q. Where did you run the plates?
A. On Super Query, the same system that we saw.
Q. And we don't have any record of what you -- what the result of that search was, right?
A. Not that we were presented with it.
Q. So you do have a record of that?
A. It's any -- just a basic license plate search.
Q. Okay. As a law enforcement officer, it's really important to document your investigative actions, right?
A. Right.
Q. Because your investigative actions can lead to courtrooms like this, and it's important to be able to show

your work, right?
A. Yes.
Q. And we have no record of whatever you did to check the plates of that vehicle, right?
A. Not to my knowledge.
Q. Okay. You have not seen any such records, right?
A. No, I have not.
Q. You did not preserve the vehicle registration checks that you conducted on that date, right?
A. No.
Q. Okay. And when you get -- in your experience, when you get a result from a vehicle registration search, what you got was the name of the person and his date of birth, right?
A. Yes.
Q. And you would have had all the information you needed to check driver's license records, right?
A. For the most part, yes.
Q. Well, all you need is the person's date of birth and their name for law enforcement databases, right?
A. For the most part, yes. There's -- it depends on what state it is. Sometimes we run their plates, and the state does not share information.
Q. Okay. So you don't know whether there was a driver's license for this information -- for this individual because you didn't check?

A. We checked what we got, what we received, which was what was exhibited.
Q. You checked for driver's license records?
A. Not for driver's license. We check for immigration status.
Q. Driver's license records show an individual's height?
A. Yes.
Q. You know that about Minnesota driver's licenses, right? I mean, they show the individual's height?
A. Yes.
Q. They show their weight?
A. Yes.
Q. Okay. You could have checked in your database to see what this individual's height was.
A. If it presented the, like driver's license, yes. But I do not recall seeing a driver's license.
Q. Well, you didn't look for one.
A. We don't see the actual picture of the driver's license. That's why we do immigration inspections.
Q. You didn't look for a driver's license information for this individual. I think that you've already testified to that, right?
A. No, we did not. We were going to ask for one.
Q. And the other thing that you would have been able to see is whether the person has corrective lenses or not because

that's listed on somebody's driver's license, right?
A. Yes.
Q. Okay. I will show you what has already been admitted as Defendant's Exhibit 1.
And you arrested the defendant, right?
A. No.
Q. You were not involved in arresting the defendant?
A. No.
Q. Okay. So you never saw his driver's license?
A. No. He never presented it to us. He fled before we were able to ask for a driver's license.
Q. I'm sorry. At the end of this incident, you arrested the defendant, correct?
A. No.
Q. You did not?
A. No.
Q. Okay. Who arrested the defendant?
A. I believe it was Agent Angel Flores. I arrested the passenger of the van.
Q. I see. Okay. And have you -- since the arrest, you have not looked at this individual's driver's license?
A. No.
Q. Have you ever looked at anyone's Minnesota driver's license?
A. Yes.

Q. Okay. And you know that, you know, using this as an example, that it lists the defendant's height?
A. Yes. Most driver's license do.
Q. Okay. And you see that he's 6 foot 6 inches tall?
A. Yes.
Q. And do you see that he uses corrective lenses?
A. Yes.
Q. Okay. So after the defendant left the apartment building on foot, he got back in his van, correct?
A. Yes. Well, we tried to approach him before he got into the van, yes.
Q. What do you mean by you tried to approach him?
A. We got off the vehicle. He saw us. We saw him. We approached him. We presented ourselves by stating, "U.S. Border Patrol." He said, "No, no, no." He started screaming, and he got in the truck.
Q. Okay. Well, I'm going to go back over what you just said in a second. But let me talk about why you got out of your vehicle in the first place. Okay? Because you were in a Chevy Suburban that day, right?
A. Yes.
Q. Was that a rental car?
A. Yes.
Q. Okay. So it had no police equipment of any kind?
A. No.

Q. It had no squad videos?
A. No.
Q. It had no emergency lights, correct?
A. No.
Q. So no emergency lights on the top?
A. No.
Q. No emergency lights inside the vehicle?
A. No.
Q. It had no sirens?
A. No.
Q. It had no megaphones or other speaker equipment that would have allowed you to broadcast a loud announcement, correct?
A. No.
Q. Okay. And none of you had any megaphones or other types of similar equipment, right?
A. No.
Q. Okay. And all of the communications, the dispatch communications, the Teams, all of that was happening on cell phones, right?
A. On government phones, yes.
Q. All of it on government issued phones?
A. Yes. We call them ATEX.
Q. But nothing within the vehicle itself?
A. No. On the ATEX only.

Q. Okay. The vehicle is completely unmarked with any law enforcement indicia on the outside, right?
A. Yes.
Q. Okay. And it has a normal Minnesota license plate?
A. I believe it had a Texas license plate.
Q. Texas license plate?
A. Yes.
Q. And so will you agree with me that the only reason you all had to get out of your car is because you had no way to signal this individual to stop using your vehicle?
A. We had to get out of our cars. It was to approach the person.
Q. Well, you couldn't have turned on any sirens to make the person stop, right?
A. No.
Q. And you couldn't have turned on any lights, right?
A. No.
Q. And you couldn't have amplified your voices, right?
A. No.
Q. Okay. And when you got -- when you all got out of the vehicle, you all put on face masks, right?
A. Yes.
Q. Okay. So you guys were all walking around, and you were all armed, right?
A. Yes.

Q. So you had guns on -- you had guns, right?
A. On us, yes.
Q. What kind of guns did you have on you?
A. Nine-millimeter.
Q. Okay. So you had tactical gear on, right?
A. Yes.
Q. Okay. It's equivalent. You can see it in the video. I mean, some folks had helmets on?
A. Yes.
Q. Okay. And they had camouflage, right?
A. No camouflage. I believe what you're referring to is the BORTAC people. They weren't present until the end.
Q. Okay. You were wearing green?
A. Yes.
Q. And a bulletproof vest?
A. Yes.
Q. And you know that that does not look consistent at all with civilian -- with city police officers, right?
A. I believe any reasonable person would assume it's a police officer.
Q. Okay. That's your testimony?
A. Yes.
Q. Will you agree with me that St. Cloud Police do not wear those when they are doing traffic enforcement or reactive enforcement in St. Cloud?

MR. RICHARDS: Objection.

THE COURT: Overruled.

THE WITNESS: I don't work with the police department here, so I'm not too sure on what they wear.

MR. SAXENA:

Q. Okay. So do you think that they walk around wearing bulletproof vests and helmets and gaiters?

A. In my experience based on prior law enforcement interactions, yes, they have a bulletproof vest on them.

Q. What about the other things?

A. The what? I'm sorry?

Q. Do they cover their faces?

A. Not all of them.

Q. Okay. And you wouldn't know because you've only been here -- you had only been here for a day before that, right?

A. No. I have been here a few days since.

Q. You had only been in St. Cloud for a day before that, right?

A. Yes.

Q. And you were not coordinating with any state and local law enforcement at any time?

A. They were not assisting us, no.

Q. Well, you didn't call them?

A. We did. They refused to assist us.

Q. You called them in connection with this incident?

A. Yes, to report the crash. They did not show up. And they -- we got issued a crash report through the phone.
Q. You did not call them before you started to pursue the defendant, correct?
A. No.
Q. All right. You said that you started to approach the defendant before he got back into the van?
A. Yes.
Q. That's not what you said during your interview though, right?
A. Yes.
Q. And that's not what your colleague --
A. No, that's --
Q. -- Agent Nunn said during his interview either, right?
A. No. That's -- that is what I said.
Q. Okay.
A. We approached him before he got in the van.
Q. Okay. Would it -- and you would expect the recording to support that then?
A. Yes.
Q. Okay.
MR. SAXENA: All right. Well, for impeachment, your Honor, I will play --
BY MR. SAXENA:
Q. And you know that your interview about this incident was

recorded, correct?

A. Yes.

Q. Okay. So I will play the recording of your interview beginning at about 45 seconds in.

THE COURT: What exhibit is it?

MR. SAXENA: I'm just offering it for impeachment, your Honor.

THE COURT: But it should be marked even if it hasn't been offered for appellate purposes.

MR. SAXENA: I would have to mark it as Impeachment 1, your Honor.

THE COURT: Make sure that it gets so marked and is included in the court's record.

BY MR. SAXENA:

Q. All right. So I will start playing this, and then I'll pause it just to make sure that you can confirm that this is in fact you.

(The Audio/visual file is played as follows:)

SPEAKER: We're working our assigned duties at St. Cloud when we spotted two subjects inside a van, so we decided to run the plates on the van. They came back with an armed and dangerous person with no legal status in the United States -- to be legally in the United States. The guy went inside his -- he went inside an apartment complex, so we waited until he came out. When he came out, he got in

the van again. We approached him from the front of the --

(The audio/video file was stopped.)

**(IN OPEN COURT)**

BY MR. SAXENA:

Q. Do you agree that he was in the van already before you started to approach him?

THE COURT: Well, that's not -- whoa, whoa, whoa.

MR. SAXENA: Yeah.

THE COURT: You were going to play a snippet to lay foundation. Make sure --

MR. SAXENA: I apologize, your Honor.

THE COURT: -- you recognize the voice first. So let's -- you're getting ahead of yourself.

MR. SAXENA: I apologize, your Honor. Thank you.

BY MR. SAXENA:

Q. Agent Muniz, I skipped a step. Was that your interview?

A. Yes, that was my interview.

Q. That was your voice?

A. Yes.

Q. That was the interview that you participated in immediately following this incident?

A. Yes.

Q. And your memory was obviously much better at that time than it is now, correct?

A. I remember vividly. I still remember.

Q. Okay. Well, this was immediately after the incident, right?
A. Yes.
Q. And it was important for you to tell the truth during that interview just like it is today, right?
A. Yes.
Q. And when you were asked about this incident on that day, you said, "He got in the van," and then you said, "We approached him." Right?
A. I might have corrected myself. I'm not sure if I corrected myself in the interview. But I remember as approaching him first, and then he got in the van and started screaming "No."
Q. Okay. So you wouldn't disagree then with your colleague Agent Nunn, who stated also that he was in the van before you approached him, right?
A. The way I remember it is we approached him first before he got in the truck.
Q. Well, it's very important, right, whether he was standing outside of a vehicle --
A. Right.
Q. -- while you supposedly said things to him or whether he was sitting in a vehicle with the door closed, right?
A. Yes.
Q. And when you were first asked about it, you said he was

in the vehicle, right?
A. Yes. That's what we just listened to.
Q. And you wouldn't disagree with your colleague Agent Nunn, who said that, too, right?
A. The way I recall it is he was outside before he got in the van.
Q. In fact, you changed your statement because the officers that were interviewing you specifically asked you to confirm that he was outside, right?
A. I don't recall the interview.
Q. Because if somebody's inside a vehicle and you're standing outside the vehicle with the door closed, there's no way to tell what they can hear, right?
A. I think you could still tell.
Q. Okay. You don't know if he had the radio on, right?
A. No, I do not.
Q. Okay. You don't know if he could hear you?
A. I don't know.
Q. You don't --
A. We heard him screaming, so we assumed he heard us, too, even once he was inside the vehicle.
Q. Well, you heard him screaming?
A. Yeah.
Q. And that was when you were approaching him with masks on and guns, right?

A. That was after the fact, yes.
Q. Okay. In fact, you wouldn't disagree then with your colleague who said that he had already started to drive away before you approached him, right?
MR. RICHARDS: Objection, your Honor. It's improper impeachment -- [inaudible].
THE COURT: Well, that --
MR. RICHARDS: I don't even know -- [inaudible].
THE COURT: Sit down. I understand the objection. Just give me a minute -- well, a second.
I'm going to sustain the objection at this point because there's nothing here about what Agent Nunn's statement -- I mean, if you can -- you're getting a step ahead of yourself.
MR. SAXENA: I understand, your Honor.
THE COURT: So as to that particular question on this particular examination up to this point, sustained.
BY MR. SAXENA:
Q. Agent Muniz, do you -- would you be able to recognize Agent Nunn's voice?
A. Maybe.
Q. Okay.
MR. SAXENA: I will -- your Honor, may I attempt to lay foundation for an audio exhibit?
THE COURT: If he can recognize it.

MR. SAXENA: Okay.

(An audio file was played as follows:)

SPEAKER: Okay. The day is January 20.

(The audio file was stopped.)

**(IN OPEN COURT)**

BY MR. SAXENA:

Q. I'm going to just go forward and see if you can identify a particular individual's voice.

(An audio/video file was played as follows:)

SPEAKER QUESTION: Agent Nunn.

And so, Agent Nunn, you said you're stationed out of El Paso, correct?

SPEAKER ANSWER: Yes, sir, El Paso.

SPEAKER QUESTION: And now, what's your current assignment for Metro Surge?

SPEAKER ANSWER: I'm on Strike Team 4.

(The audio/visual file was stopped.)

BY MR. SAXENA:

Q. Can you recognize that person's voice that said "Strike Team 4"?

A. No. I don't -- I didn't interact with him as much.

Q. All right. We'll move past that.

So your recollection is not that the person started driving away before?

A. No.

Q. Okay.
A. I believe Agent Nunn was on the left side in the back. I'm not sure if his same point of view was the same as mine since I was on the right side passenger -- traveler event side.
Q. Okay. And let me now show you -- you talked about your -- what you were wearing that day, right, during your direct testimony?
A. Yes. My gear.
Q. Okay. And which officers or agents approached the van when you were initially trying to do so on foot?
A. It was myself, Agent Nunn, and I believe Agent Ortiz.
THE COURT: I'm sorry, I didn't catch the last name.
THE WITNESS: Agent Ortiz, Nunn, and myself, Muniz.
BY MR. SAXENA:
Q. Okay. Do you know who is in Defense Exhibit 5 that I'm showing you?
A. Yes. That's one of our backup -- that would have backed us up.
Q. All right. So that is not one of the individuals that was in the vehicle with you?
A. No.
Q. Okay. Let's look at Defense Exhibit 4, which is body

camera footage from Agent De La Mora, and I'm going to forward that to timestamp 616.

Do you know who this individual is that is depicted at 616 on Defendant Exhibit 4?

A. That's Agent Nunn.

Q. That's Agent Nunn?

A. Yes.

Q. Okay. And that's consistent with what you and your colleagues were wearing that day, right?

A. I was not wearing camo but --

Q. You were not wearing camo?

A. No. I don't have all the gear he has on.

Q. Okay. But he was wearing camo, right?

A. Yes, he was.

Q. Okay. And the only indicia that he is a police officer is low down on his utility vest?

A. It says Police, and he also has a badge.

Q. Where is the badge?

A. Next to where it says Echo 401.

Q. Okay. And your testimony is that the defendant was about how far away from you when you approached him?

A. Like from here to the stand.

Q. Only ten feet?

A. About.

Q. Okay. And the camera in this still frame is much closer

than that, right?
A. Yes.
Q. Okay. I'm going to play forward a little bit, and then we'll stop again.
(The audio/video file is played as follows:)
SPEAKER: You all okay? You all got [indiscernible].
(The audio/video file is stopped.)
BY MR. SAXENA:
Q. Okay. I want you to watch the person who is the furthest away that's going to be approaching on the right side of the screen.
(The audio/video file is played and stopped.)
BY MR. SAXENA:
Q. Is that you?
A. I believe so, yes.
Q. Okay. So the person on the furthest right-hand side of the screen is wearing a face mask and what looks like a warm hat. That's you?
A. Yes.
Q. Okay. And you're about one car length away from the camera right now, right?
A. I wouldn't be able to tell, but about, yes.
Q. Well, you're at the front of that Chevy Suburban, right?
A. Yes.

Q. And --

THE COURT: For the record, what's the timestamp on this stilled image?

MR. SAXENA: Yes, your Honor. It's 6:29.

THE COURT: 16:29 or 6:29?

MR. SAXENA: 6:29. Six minutes and 29 seconds. And on the squad video it is --

THE COURT: Well, the reason I'm asking is because when you used the same exhibit before with the image of Agent De La Mora, it was 16:16. And then you said I'm going to move ahead, and now we're down to 6:29. You can't move ahead and go backwards, so I just want to make sure it's clear to --

MR. SAXENA: I apologize, your Honor. This exhibit is Defendant Exhibit 4. It's from the squad video of -- the body cam video of Agent De La Mora, and I froze it at about 6:16, six minutes and 16 seconds.

THE COURT: Was the image of Agent Nunn --

MR. SAXENA: That was the image --

THE COURT: Six minutes, not --

MR. SAXENA: -- of Agent Nunn.

THE COURT: -- 16? Okay. 6:16.

MR. SAXENA: My apologies.

THE COURT: No. That's all right. I just wanted to make sure that we're clear here. And so this image is

6:29.

MR. SAXENA: Correct.

THE COURT: All right. There we go.

BY MR. SAXENA:

Q. All right. So you're about one car length away, right?

A. Yes.

Q. Which is about less than ten feet?

A. About, yeah.

Q. Okay. And this is an approximation of what somebody ten feet away could see, right?

A. Yes.

Q. Okay. All right. So then you earlier stated that there was some difference between a vehicle pursuit and following; is that right?

A. Yes. We didn't have lights.

Q. So you weren't pursuing the vehicle?

A. No.

Q. And you were not authorized to pull it over?

A. No. But we are with equipment, yes.

Q. What equipment?

A. Lights and sirens.

Q. You didn't have lights and sirens?

A. No.

Q. So that vehicle that you were in was engaged in an unlawful vehicular pursuit, correct?

A. It was not a pursuit, no.
Q. Because you were only following him?
A. Yes.
Q. And it would have been unlawful for you or anyone else to try to stop the vehicle, right?
A. No.
Q. Well, you're from the --
A. Based on the exigent circumstances, I would view it as reasonable.
Q. Is that consistent with your training?
A. An exigent circumstances? Yes.
Q. What was the exigency?
A. He was armed and dangerous -- or we believed at that time that he was armed and dangerous, and we believed him to be the person we were looking for. The way he reacted -- the way he reacted made our reasonable suspicions higher.
Q. So your testimony is that any time law enforcement has any information that someone is armed and dangerous based on anything, you can pull them over in an unmarked -- or in an unmarked rental car; is that right?
A. No.
Q. Okay. But you just said the exigency was he was supposedly undocumented, and --
A. Armed and dangerous.
Q. And the armed and dangerous indication came through the

Super Query?
A. Yes.
Q. And Teams?
A. Yes.
Q. And Agent Flores who looked at the Teams?
A. Yes.
Q. And that's it?
A. That's it what? I'm sorry.
Q. Those are the reasons why you believe that you were able to try to pull over that vehicle without any sirens?
A. That was the reason why we approached the subject on foot and --
Q. Okay.
A. -- tried to determine citizenship.
Q. Okay. So after the individual got in the, you know, after the individual started driving, you followed them, right?
A. Yes. It raised our suspicion.
Q. And you're contesting whether that was a pursuit of the vehicle, right?
A. Yeah. We did not pursue.
Q. Okay. You were trying to stop the vehicle, right?
A. We were trying to see where it was going and --
Q. Oh --
A. -- then that's when it rammed us.

Q. All right. So you tried to box in the vehicle?
A. After the fact that it rammed into us.
Q. All right. So your testimony is that you and your support vehicle did not attempt to box in the vehicle until after the collision?
A. Correct.
Q. But that's not what you said during your interview, is it?
A. I don't recall the interview.
Q. All right. I played for you a portion of your interview previously. I will continue.

This is Impeachment Exhibit 1, which the witness has already authenticated.

MR. SAXENA: I'm going to forward it to -- okay. Two minutes exactly.

(The audio/video file is played as follows:)

SPEAKER ANSWER: We were still right behind him. When we were driving after that, I want to say we had already called enforcements or backup. So the backup gets there, and they tell us they are going to try to box it in. So we're able to overtake the van, get in front of it. Somehow he got behind us and -- when we were in front of him, he gets behind us and clips us on the back -- no, he clips us in the front. Sorry. And as he clips us, we kind of brake, and they go on the wrong side of the road.

(The audio file is stopped.)

**(IN OPEN COURT)**

BY MR. SAXENA:

Q. So when you said on your interview that happened on January 20, "He clips us," he clips you -- first you said "He clipped us on the back, no, he clipped us on the front," that was the collision, right?

A. Yes.

Q. Okay. And before that you had already called for reinforcements, right?

A. Yes.

Q. So a silver, I believe it's a Wagoneer shows up, right?

A. That was one of them, yes.

Q. Do you know which vehicle showed up first?

A. No.

Q. You don't remember?

A. No.

Q. Okay. And there's no video of that from that vehicle, right?

A. I'm not sure. A lot of us have body-worn cameras. All of us had body-worn cameras.

Q. You haven't seen any video from that vehicle, and neither have I, right?

A. No. I don't know if you have. I have not.

Q. Okay. And that vehicle, as you just said, was there to

box in the defendant's vehicle, right?
A. No. I said we called backup to try to box him in.
Q. You called for backup for the purpose of boxing him in, right?
A. No. We were -- yeah, that's what we were thinking we were going to do eventually.
Q. Okay. And they told you that they were going to box him in?
A. I'm not too sure they told me that.
Q. Well, that's what you just said on the interview; isn't that right?
A. Can you replay it?
Q. Sure.

(The audio/video is played as follows:)

SPEAKER: When we were driving after that, I want to say we had already called reinforcements or backup. So the backup gets there, and they tell us they are going to try to box it in. So we're able to overtake the van. We get in front of it. Somehow he got behind us. And when we were in front of him, he gets behind us and clips us on the back.

(The audio file is stopped.)

**(IN OPEN COURT)**

BY MR. SAXENA:
Q. Okay. Will you agree with me now that your goal and

your backup's goal was to pull over the vehicle by boxing it in?
A. That's what it sounds like, yes.
Q. And oftentimes when you and your colleagues at Border Patrol engage in these vehicular pursuits, a box-in is accomplished by literally running into the vehicle, right?
A. No.
Q. You run the vehicle into the curb; isn't that what you do?
A. No.
Q. You get on either side of the vehicle and you run it into the curb --
A. No. That's not a --
Q. -- because --
A. -- box-in maneuver.
Q. Because you don't have lights and you don't have sirens?
A. That's not a box-in maneuver.
Q. The only time that you as a pursuit vehicle would get ahead of the vehicle you're pursuing is if you have backup behind you, right?
A. Yes. It depends on what circumstance it is.
Q. In this circumstance, the reason that you all drove to a point where you were ahead of and beside the defendant's van is because you and your backup were trying to run it into the curb and make it stop, right?

A. We were not trying to make it run into the curb.
Q. You were trying to make it stop?
A. We were trying to make it stop, yes.
Q. Okay. And the only way you can do that without lights and sirens is by boxing the vehicle in?
A. Yes.
Q. And that was an unlawful vehicular pursuit, right?
A. That was not a pursuit, no.
Q. You are able -- is it your testimony that you're able to stop a vehicle without engaging in a pursuit?
A. Yes, by boxing them in.
Q. And that's not a vehicular pursuit?
A. No. So when -- boxing in is somebody gets in front and starts driving slower so the person can drive slower.
Q. And you're able to do that without lights and sirens?
A. It depends on the situation.
Q. Are you familiar in your training and experience with the public U.S. Customs and Border Protection emergency driving and vehicular pursuits policy?
A. Yes.
Q. Okay. And so that would tell us whether what you did is lawful, right?
A. Yes.
MR. RICHARDS: [Inaudible.]
THE COURT: Overruled.

BY MR. SAXENA:

Q. Would it?

A. To a certain extent, yes. It depends on the situation, like I said.

Q. Who gets to decide if it's lawful?

A. The driver or whoever the supervisor is and tells it to dismiss.

Q. Okay. Is it consistent with -- are you familiar with 8 C.F.R. 287.8? Is that something you get trained in?

A. Can you -- I would have to look up the code. I'm not too sure.

Q. Okay. It is the regulation that governs standards for enforcement activities for Border Patrol agents and other DHS agents. Are you familiar with that?

A. Yes.

Q. Okay. And so you're familiar then with the definition of and the limits on vehicular pursuits, right?

A. Yes.

Q. Okay. So you would agree that a vehicular pursuit is an active attempt by a designated immigration officer in a designated pursuit vehicle, meaning a vehicle with lights and sirens, to apprehend fleeing suspects who are attempting to avoid apprehension, right?

A. Okay.

Q. That's what you were doing, right?

A. No, we were not.
Q. You were not trying to stop the person?
A. We were trying to stop the person after he -- after he clipped us, yes.
Q. You were trying to stop him before he clipped you.
A. Yes -- what I mean is we were trying to stop the person before he took off. At that point we had reasonable suspicion that it was the person, so that's why we continued to follow him.
Q. Let's watch Government Exhibit --
MR. SAXENA: I apologize, your Honor. I believe that's [indecipherable] 5.
THE COURT: Correct.
MR. SAXENA: Sorry.
BY MR. SAXENA:
Q. Let's watch Government Exhibit 4.
(The audio/video file was played and then stopped.)
BY MR. SAXENA:
Q. All right. So at the beginning of this, you are already pursuing the van, correct?
A. We were following it, yes.
Q. Okay. And you mentioned earlier that there are traffic -- there were some traffic violations, right?
A. Yes.
Q. But you have no authority to stop anyone for traffic

violations, right?
A. No. That's not the reason we were trying to stop him.
Q. My question is, you have no authority to follow anyone for traffic violations, right?
A. No.
Q. Because you were not coordinating with state and local law enforcement?
A. No.
Q. All you could have possibly done in this instance is try to arrest the person for being unlawful -- unlawful immigrant, correct?
A. Yes.
Q. That's it?
A. At that time, yes.
Q. And you had not confirmed that this individual was a lawful immigrant yet because you hadn't identified the person, right?
A. No.
Q. You had not identified him?
A. We believed there was a person that we had not verified.
Q. So you had no basis to stop the vehicle at this time, which is why you're saying you weren't pursuing the vehicle, right?
A. We were not pursuing the vehicle, no.
Q. But the reason you're saying you weren't pursuing them

is because you had nothing that you could arrest the person for at this time, right?
A. At that time, no.
Q. And you can control your own body camera and turn it on whenever you want?
A. When we're not in our unit, yes.
Q. Okay. And so you did not -- you chose not to turn on your body camera footage when you were following the van before it parked in the parking lot, right?
A. We are trained to turn it on when it's feasible.
Q. You did not turn it on when you were following the van before it parked in the parking lot, right?
A. It was not feasible. It was not necessary for me.
Q. Okay. My question to you is, you did not, correct?
A. No.
Q. Okay. And then you did not turn it on when the defendant got out of his van to go inside the apartment, right?
A. No.
Q. You did not turn it on when he got out of the apartment, right?
A. No.
Q. You did not turn it on when you approached the van or him or whatever the testimony shows, right?
A. No.

Q. Okay. The only time you turned it on was after you started pursuing the vehicle, right?
A. No.
Q. When else did you activate your slow cam --
A. I activated my --
Q. -- or your body cam?
A. -- body cam when -- I believe when he clipped us.
Q. Well, it's active now, right, on the screen --
A. Right. So the camera records two minutes prior to activating.
Q. Okay. So the first time you turned it on was when?
A. Two-minute mark.
Q. Is that why there's no audio for the first two minutes?
A. Yes.
Q. And you know that that's how the body camera works?
A. Yes.
Q. And so you know that nobody would ever be able to see anything that happened before that?
A. I'm not too sure they have access to prior recordings of that, no.
Q. You haven't seen anything, right?
A. I have not, no.
Q. So I'm going to play the video, and I want you to tell me because there's no audio --
A. It's at the two-mile mark -- at the --

Q. I'm sorry. You have to let me finish my question. I know I paused there, and I apologize.

As we watch this video, you have two cell phones in front of you. Do you see that?

A. Yes.

Q. Okay. What were you doing with the two cell phones?

A. I do not recall. I believe one had the checks, and I believe the other one was Agent Angel Flores'.

Q. You were using Agent Flores' phone?

A. Yes. He was driving. He could not use his phone.

Q. And you --

A. He was not --

Q. -- [inaudible] you were doing?

A. I do not recall, no.

Q. Okay. Is this the first time that you checked the plates, after you had already started pursuing?

A. No.

Q. And there's no proof of what you just said other than your own testimony, right?

A. I'm not sure if the Super Query keeps a record on it.

Q. Well, you haven't checked, right?

A. I don't have access to that, no.

Q. Okay. So you don't know what you were doing at this time?

A. No, I don't recall.

Q. You could have been checking the plates for the first time right there, right?
A. The way I recall it, no, I didn't. I checked the plates before.
Q. Okay. And then, as you previously testified, there's no reason for you to get up alongside a vehicle that you're following unless you have backup behind you, right?
A. That's not the only reason one would get on next to it.
Q. Well, what was the reason in this case?
A. I don't recall. I was not driving.
Q. Okay. You got up next to the vehicle in this case because you had backup that was trying to box the vehicle in, right?
A. That's what the -- that's what it sounds like we were seeing.
Q. Well, that's what you said, right?
A. That's what it sounds like we were seeing, yes.
Q. So now, you get up next to the vehicle, right? Is that right?
A. I'm not sure where the vehicle is at this point.
Q. You did not see it pass by on the left side?
A. No. I believe it was on the left side at one point, and it was going to hit us. That's why Angel Nunn maneuvered to the right.
Q. Can you see the van in this still?

A. Yes.
Q. Okay. This is at 1:36. You can see the van?
A. Yes.
Q. Okay. And it's on the left side of the vehicle here?
A. Yes.
Q. And we can't see behind your vehicle, right?
A. No.
Q. And assuming for the sake of this hearing that there is no video from your backup vehicle, we don't know what happened behind you, right?
A. No.
Q. Okay. So that backup vehicle could have slammed into the back of that van, and there is no proof one way or the other?
A. I wouldn't know.
Q. So at this time, you cannot say one way or the other whether a Border Patrol vehicle slammed into the back of this van?
A. I remember the white van slamming. But it wasn't to the back of the truck. It was to the front.
Q. Okay. There's the collision, right?
A. Yes, in the front.
Q. Okay. And we can't see the backup vehicle in this video at all, right?
A. No.

Q. And the road conditions were not good, right?
A. They were icy.
Q. So vehicles can slip and slide, right?
A. Possibly.
Q. And this is when you were trying to box the vehicle in, right? I stopped it at 1:49.
A. At that point we couldn't box -- I don't think you were able to box a car in like that.
Q. Well, you were trying?
A. I was not driving.
Q. Your colleague who was driving, that's what you were -- that's what you and your colleagues were trying to do?
A. I believe so.
Q. And so your testimony today is you can't be sure whether Border Patrol first made a collision with the defendant's vehicle or whether he first collided with a Border Patrol vehicle, right?
A. No. I can -- I physically saw the truck hitting us first.
Q. Okay. But you don't know whether the backup vehicle struck his vehicle first?
A. I don't recall the backup vehicle behind them, no.
Q. Okay. All right. Did you participate in the transportation of Mr. Jama, the defendant, to the Whipple Building after his arrest?

A. I believe so.
Q. So you were in the same vehicle with him?
A. Yes.
Q. And did you and your colleagues take selfie photographs of him?
A. No. I don't recall that.
Q. Okay. Did you take any video of him?
A. Other than the body-worn camera, no, I don't recall that.
Q. Why did you turn your body camera off before you transported him to Whipple?
A. Because we're allowed to turn it off after we are -- after it's feasible, after there's no more danger.
Q. You're allowed to, but you didn't have to turn it off, right?
A. We didn't have to, no.
Q. But you chose to turn it off and not document whatever happened on the way to Whipple, right?
A. Yes, we chose to turn it off.
Q. Okay. And you know that with the other individual, the passenger in the vehicle, they left their videos on so we can see exactly what happened on the way to Whipple with the other individual that was arrested, right?
A. I don't know. I haven't seen the other body-worn camera.

Q. Okay. But the exhibits would tell us if there's video of that individual being transported, right?
A. Possibly, yes.
Q. Okay. So you just decided of your own accord to turn off your video so that we can't see what happens on the way to Whipple?
A. Yes. We usually do.
Q. Okay. And your colleague, Mr. Nunn, did the same?
A. I believe so. I'm not too sure.
Q. Do you know whether Mr. Jama was taken before an immigration judge as soon as possible after his arrest?
A. After we got to the Whipple Building, I don't know what happened to Mr. Jama.
Q. Do you know whether agents tried to get a warrant that would support his arrest immediately after his arrest?
A. I don't know what happened after we turned him over.
Q. Did you participate in any efforts to bring him in front of a judicial officer or obtain any warrant for his arrest?
A. I don't -- I don't recall that, no.
Q. Have you reviewed anything which would suggest what happened after he was arrested?
A. No.
Q. Did you participate in arresting him later when he was ultimately charged?
A. No.

Q. Okay. Is your compensation based in any way on the number of arrests that you completed during Operation Metro Surge?
A. No. We're not bounty hunters.
Q. So that's a no?
A. No.
Q. Okay. And you don't remember how many arrests you did that day?
A. No.
Q. What was your shift that day? How many hours had you been on duty?
A. I believe we worked ten-hour shifts. I don't recall the time we worked.
Q. Do you know how long you had been on duty that day?
A. No.
Q. Do you have any certificates of training records?
A. It depends what -- yes. I have a few records of certificates.
Q. And those would demonstrate when you completed training?
A. It depends what type of training, yes.
Q. Okay. Do you have any certificates of when you received training on the vehicular pursuit policy?
A. Not to my knowledge because that's at the academy.
Q. Okay. Did you get an update on the vehicular pursuit policy at any time in 2025?

A. I believe so.
Q. When?
A. I don't recall.
Q. Do you know when the vehicular pursuit policy was revised in 2025?
A. No.
Q. Do you know the last time that you reviewed any information about the vehicular pursuit policy?
A. No. They did push out information as it comes by.

MR. SAXENA: All right. Your Honor, I would like to offer Exhibit, what I had marked as Impeachment 1. I will remark it as Defense Exhibit 9. And that is the audio recording of Agent Muniz's interview with HSI agents on January 20.

THE COURT: Mr. Richards?

MR. RICHARDS: Your Honor, the government would submit for the rule of completeness that at least up until seven minutes and 47 seconds, if not the entirety of the exhibits, should come in. There's supplemental questioning by the interviewer specifically as it relates to the subject of whether or not the agent saw the defendant outside the car versus inside the car, where the defendant gave statements that are consistent with his testimony today. So for rehabilitative purposes, that portion of the recording should come in as well.

THE COURT: My understanding was that the whole exhibit was being offered --

MR. RICHARDS: Then --

THE COURT: -- so it's -- I mean, I understand your point, but it would have all come in anyway.

MR. RICHARDS: Okay. Then yes, I have no objection, your Honor.

THE COURT: All right. So --

MR. SAXENA: Yeah, your Honor, that was my understanding.

THE COURT: So Defense Exhibit 9, previously known as Defense Impeachment Exhibit 1, is admitted for purposes of this hearing.

MR. SAXENA: And, your Honor, although I think there may be an objection, I will also offer the audio recording of Agent Nunn's interview with HSI on the date January 20 into evidence. I understand that Agent Muniz is not able to identify the individual, but this recording was provided to us by the government, and it has other indicia of authenticity as provided in the government's discovery. So I would offer it as Defense Exhibit 10.

THE COURT: Mr. Richards?

MR. RICHARDS: No objection, your Honor.

THE COURT: Defense Impeachment Exhibit 2 is now known as Defense Exhibit 10 and is admitted for purposes of

this hearing.

MR. SAXENA: Thank you, your Honor.

THE COURT: Anything else?

MR. SAXENA: Not from the defense, your Honor.

THE COURT: You're done with the cross?

MR. SAXENA: I am done with the cross. Thank you, your Honor.

THE COURT: All right. Redirect?

MR. RICHARDS: No further questions, your Honor.

THE COURT: May the witness be excused?

MR. RICHARDS: Yes.

THE COURT: Mr. Saxena?

MR. SAXENA: Yes, your Honor. Pass the witness.

THE COURT: All right. You're excused. You may leave or stay. It's up to you. The witness will not be recalled.

The government rests?

MR. RICHARDS: The government rests, your Honor.

THE COURT: All right. Do you still intend to call your witness?

MR. SAXENA: I would, your Honor. It should be a very short witness.

THE COURT: All right. But we're still going to take a recess. I can't see the clock. What time is it up there?

MR. SAXENA: It's 4:12.

THE COURT: All right. We'll be back at 4:25.

MR. SAXENA: Thank you, your Honor.

(A recess was taken at 4:12 p.m. until 4:28 p.m.)

THE COURT: Are you ready, Mr. Saxena?

MR. SAXENA: I am, your Honor.

Defense calls Abdirashid Adan to the stand. And he's in court.

THE COURT: Please come forward. Please face the courtroom deputy.

THE COURTROOM DEPUTY: Will you raise your right hand.

You do solemnly swear that all the testimony you are about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURTROOM DEPUTY: Once seated, please state your full name and spell your last name.

THE WITNESS: First name is Abdirashid, A-b-d-i-r-a-s-h-i-d. The last name is Adan, A-d-a-n.

(Abdirashid Adan)

DIRECT EXAMINATION

BY MR. SAXENA:

Q. Okay. Good afternoon, Mr. Adan. You can actually pull

that microphone right in front of you. There you go. Perfect.
A. Okay.
Q. All right. Sir, how long have you lived in the United States?
A. Since 2000.
Q. Okay. And when you arrived here in 2000, what was your immigration status?
A. I came as a refugee.
Q. Okay. And so you had refugee status?
A. Correct.
Q. How long did you maintain that status?
A. Since 2007.
Q. Okay. And what happened in 2007?
A. I became a U.S. citizen.
Q. How did you become a U.S. citizen?
A. I went to the immigration task force, answered questions, and then when I pass, I get my certificate and passport.
Q. Okay. And is it your understanding that the United States Government issued you a naturalization certificate and granted you U.S. citizenship in 2007?
A. Yes.
Q. And is that why your refugee status expired?
A. Correct.

Q. Okay. And would you expect based on the process of naturalization that the U.S. Government kept records that demonstrated when your refugee status ended and when your citizenship status began?
A. I didn't know that.
Q. Okay. But you got your citizenship from --
A. Correct.
Q. -- the U.S. Government?
A. Yes.
Q. Okay. Now, did I ask you to provide copies to me of your passport and your citizenship certificate?
A. Yes.
Q. And you have those in your possession, and you took photographs of those?
A. Correct.
Q. Okay. I'm going to show you what I have marked for identification as Defense Exhibit 7. Do you recognize the document that I put up on the screen as Defense Exhibit 7?
A. Yes.
Q. What is that?
A. My passport.
Q. Okay. And does that passport demonstrate your U.S. citizenship?
A. Yes.
Q. Okay. And is your date of birth accurately listed on

the passport?
A. Yes.
Q. Okay. And that's January 1, 1982?
A. Yes.
Q. And your correct legal name is Abdirashid Jama, correct?
A. Yes.
Q. Okay. I'm also going to show you what I've marked as Defense Exhibit 8. And do you know what Defense Exhibit 8 is?
A. Yes.
Q. What is that?
A. The certificate, birth certificate with the --
Q. Okay. For naturalization?
A. Yes.
Q. Okay. And is that a true and correct copy of your certificate granting you naturalized citizenship in the United States?
A. Yes.
Q. Okay. And if you look in the lower right-hand corner -- I'll try to enlarge it here. Does that state the date on which you received your naturalization or your naturalized citizenship?
A. Yes.
Q. And what was the date?
A. February 24, 2007.

Q. Okay. So was there ever a time when you were in the United States without lawful status?
A. No.
Q. Okay. So you've always had lawful status from the time that you entered the United States until now?
A. Correct.
Q. Okay. Have you ever been arrested for any crime involving having a firearm?
A. No.
Q. Have you ever been arrested for any crime at all?
A. No.
Q. Have you ever had any encounter with law enforcement that would have resulted in you being called, quote, armed and dangerous for any reason?
A. No.
Q. And do you think that government records should show that you haven't had any of those interactions involving a firearm, right?
A. In my knowledge, no.
Q. Do you own a white work van?
A. Yes.
Q. Okay. And do you allow -- well, what's your business generally?
A. I'm a diesel mechanic, and I also run my fleet, which is about eight trucks, and I use that van for parts

transportation, and sometimes drivers use to get food and what they need to get from the town.
Q. Okay. So you have some employees or contractors that work for you?
A. Yes.
Q. Okay. And is the defendant, Mr. Jama, one of those people?
A. Yes.
Q. All right. And did you let him use that van on January 20?
A. Yes.
Q. Okay. And that's something that you do regularly for your employees?
A. Yes.
Q. And including Mr. Jama?
A. Yes.
Q. Okay. And that vehicle is registered to you?
A. Yes.
Q. Do you have a Minnesota driver's license?
A. Yes.
Q. Okay. And to your knowledge, have you ever had any issues with your driver status?
A. No.
Q. So you've consistently held a Minnesota driver's license for several years?

A. Yes.
Q. Did you hold a Minnesota driver's license on January 20 of 2026?
A. Yes.
Q. Okay. And you got that from the State of Minnesota?
A. Correct.
Q. Does it list your height?
A. Yes.
Q. Okay. What's your height?
A. I think it says 5'6".
Q. Okay. And is that your accurate height?
A. Yes.
Q. Okay. Are you about 5'6"?
A. I think it says 4'6" or 5'6". I'm not sure.
Q. Okay.
A. Sorry.
Q. But you're not 6'6"?
A. No, I'm not 6'6", no.
Q. Okay. And do you regularly wear glasses?
A. No.
Q. You do not wear glasses?
A. No.
MR. SAXENA: All right. I have no further questions.
THE COURT: Do you want to move the admission of 7

and 8?

MR. SAXENA: Oh, I'm sorry.

THE COURT: You identified them, but you didn't -- what do you want to do with them?

MR. SAXENA: Yeah, I would like to offer Defense Exhibits 7 and 8. Thank you for reminding me, your Honor.

THE COURT: Objection?

MR. RICHARDS: Yes, your Honor. Same objection as before, under Rule 403 with respect to relevancies. This is a collateral document that relates to third-party identity. The inquiry for the Court's determination is the reasonableness of the officer's information and actions at the time that it occurred. This is outside the scope.

MR. SAXENA: Well, my response, your Honor, is, I mean, I think relevance is 103. It's not unfairly prejudicial I don't think under 403, first of all, but --

THE COURT: Well, relevance is 402.

MR. SAXENA: Relevance is 402. So I'm wrong, too.

So, your Honor, there's two issues. One is we have not -- the government has not established the credibility or reliability of the database checks that are the sole reason why they supposedly conducted a *Terry* stop and then tried to conduct a warrantless arrest and stop of this vehicle. And I think what the testimony of Agent Muniz has demonstrated and the testimony of Mr. Adan has

demonstrated is that those records were not reliable or they were incomplete, and there's been evidence that perhaps they are intentionally incomplete. And so I think that this helps complete the record as to credibility of those and reliability of the records on which the government relied.

MR. RICHARDS: And I guess I would just add, your Honor, that these are --

THE COURT: Well, I don't -- okay. I was tracking with you until you said there's evidence that the Super Query system, CIS, Government Exhibits 2 and 3 were intentionally incomplete. I don't recall that.

MR. SAXENA: Your Honor, if you recall, I asked Agent Muniz about why there are three records. He testified, yes, there were three records.

THE COURT: There are two pages that haven't been produced, but the system itself intentionally incomplete, that's what I don't -- there's nothing here that tells me that.

MR. SAXENA: That was not my argument.

THE COURT: Okay.

MR. SAXENA: The system itself may very well be complete, but the agent testified about what he relied on, and I believe the record does reflect that the agents --

THE COURT: The query returned three pages, and only two -- one has been identified.

MR. SAXENA: Well, or the individuals on Teams saw additional information that is in the possession of the U.S. Government and didn't relay it. But regardless --

THE COURT: I mean, you don't --

MR. SAXENA: -- of the basis --

THE COURT: You don't have any testimony that way either. We just don't know.

MR. SAXENA: The government hasn't produced that testimony, your Honor, but --

THE COURT: I know. You're making conclusions to the contrary. And so, you know, I understand the point, but --

MR. SAXENA: Yeah.

THE COURT: -- I'm not sure that it goes to proving the opposite either.

MR. SAXENA: Well, your Honor, I would like to brief it. I think that the government regularly argues that they get to take advantage of everything that was known by all of the agents and officers. And I think the testimony we saw today is that Agent Muniz was trying to take advantage of everything that was known to the other officers on the scene. And what was known was information that was vetted through supervisors that should have had access to his citizenship information.

THE COURT: All right. Mr. Richards, for purposes

of your objection, is there any question -- I mean, in my mind there's not, that Mr. Jama is the same Mr. Jama that shows up in Exhibits 2 and 3?

MR. RICHARDS: No, your Honor.

THE COURT: Okay. Then on that basis, the records are relevant whether they are going to be probative or carry great weight. We'll let you argue that. But since there's no question about we have an apparent discrepancy between two official government systems, they are coming in.

MR. RICHARDS: Yes, your Honor.

MR. SAXENA: Thank you, your Honor.

THE COURT: All right.

MR. SAXENA: I have no further questions.

THE COURT: Cross?

MR. RICHARDS: No questions, your Honor. Thank you.

THE COURT: All right. Thank you, sir. You're excused.

THE WITNESS: Thank you.

MR. SAXENA: The defense rests, your Honor.

THE COURT: All right. Any rebuttal witnesses?

MR. RICHARDS: No, your Honor.

THE COURT: Any rebuttal exhibits?

MR. RICHARDS: No, your Honor.

THE COURT: Okay. All right. Then, so again,

admitted and accepted for the purpose of this hearing is Government Exhibit 1, which is the thumb drive. The substantive exhibits are 2, 3, 4, 5, and 6, two photos, the body camera recording and two photos. Defense Exhibits 1 through 8 have been offered and admitted. And then Defense Exhibits 9 and 10 were given a new nomenclature from Impeachment Exhibits 1 and 2, respectively, and they have been admitted.

All right. Before you leave, make sure we get all of that. So I'm sure -- I'm assuming you have copies, Mr. Saxena, of all the recordings and Exhibits 1 through 8, Exhibits 9 and 10. Make sure you give us Exhibit 1.

All right. And then you need to meet and confer afterwards regarding what personal identifier information, if any, you think needs to be locked down. There's nothing going to be on CMECF. So I'm not sure that in the short-term anybody is going to be coming here asking to see the court file, so probably a little excess of caution that's maybe not necessary. Because until the briefs are filed, no one is going to know -- unless they listen, order the transcript, which no one is going to do that, either. So you guys can meet and confer about that. I'm not sure there's any super urgency right now. Anything that's admitted and is referenced by the Court in any order or report of recommendation will obviously be redacted by us.

So just take all that into account. I'm not sure there's any real need, but you can talk about that. And if you think there is, then you can come to some agreement and submit a stipulation as to what you want me to do with those, and I'll consider it.

Mr. Saxena, do you still wish to have a copy of the testimonial transcripts today before you submit your briefing?

MR. SAXENA: Yes, your Honor.

THE COURT: Okay. Are you going to order a 14-day transcript?

MR. SAXENA: Yes, your Honor.

THE COURT: Okay. Once you receive the 14-day transcript, how much time for your memorandum?

MR. SAXENA: Is 21 days too long, your Honor?

THE COURT: Okay. I'm asking you.

MR. SAXENA: 21 days.

THE COURT: Okay. So three weeks, 21 days.

How much time for the government's response once you receive the defense's memorandum?

MR. RICHARDS: The government would ask for the same amount of time.

THE COURT: All right. I'm not inclined to question the 21 days since Mr. Jama is not in custody and is out on conditions, but that will put you well into the

summer, June or July, by the time it comes under advisement to me, late June, I think, at least. My brother is a chemist. He does the math. I don't. But it will be early July by the time the government's brief is in. So just be aware that it's going to take time after that to get the R and R out. We will get the discovery order out here in the next couple weeks at the latest.

All right. Anything else today from the government?

MR. RICHARDS: No, your Honor.

THE COURT: Anything else from the defense?

MR. SAXENA: No, your Honor. Thank you.

THE COURT: All right. Then we are adjourned. Thank you.

(Court adjourned at 4:44 p.m.)

* * *

I, Lori Morrow, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by: ______________________
*Lori Morrow, RDR, CRR, CRC*